589 So.2d 507 (1991)
Daniel Carl TANNER, as Curator of Betty C. Tanner
v.
FIREMAN'S FUND INSURANCE COMPANIES, et al.
No. CA 90 0134.
Court of Appeal of Louisiana, First Circuit.
October 18, 1991.
Writ Denied January 10, 1992.
*508 Charles Wm. Roberts, Richard J. Dodson, Baton Rouge, for plaintiff.
Clifton Bingham, Jr., Dept. Risk Litigation, Baton Rouge, Jack Pierce Brook, Daniel E. Zelenka, II, William V. Redmann, New Orleans, La., for defendants.
Before WATKINS, SHORTESS, SAVOIE, CRAIN and FOIL, JJ.
CRAIN, Judge.
Plaintiff, Betty C. Tanner, seeks to recover damages for the severe injuries she sustained in a vehicular collision on the night of December 19, 1986.[1] The plaintiff was a passenger in a pickup truck driven by her husband, Donald Tanner, when it collided with a tractor trailer rig straddling the highway, completely blocking both lanes, outside of Valdosta, Georgia. Prior to and at the time of the accident, Mr. Tanner suffered from a degenerative eye disease.
The plaintiff originally named several parties as defendants, but she dismissed them prior to trial against the remaining defendant, the State of Louisiana through the Department of Public Safety and Corrections (DPS).[2] Following a bench trial, the judge issued written reasons for judgment wherein he found that DPS was liable *509 to the plaintiff for its failure to administer eye examinations to Mr. Tanner when he renewed his driver's license after 1970, although Mr. Tanner had failed the eye examination in 1970 and was only issued a driver's license with restrictions after further testing by an optometrist. The trial judge found that DPS' failure to administer the eye examinations was a breach of its statutory duty under LSA-R.S. 32:408;[3] that this breach was a cause of the accident, because Mr. Tanner would not have been given a driver's license had he been tested, nor would he have been driving if he had known that his visual acuity posed any threat to safe driving; that "a driver who would have had the requisite visual ability required statutorily in Louisiana for license[d] drivers could have easily brought his vehicle under control and slowed the vehicle in which plaintiff was riding to a stop before the collision ... ever took place"; and that the plaintiff and her husband were not at fault because while they were aware of the eye disease they had a good faith belief that his eyesight was sufficient to enable him to be a properly licensed driver. The trial judge also stated that he was not required to determine the fault of the previously dismissed parties, but that in his opinion DPS was 65% at fault and the truck in the roadway was 35% at fault. The trial judge awarded the plaintiff damages as follows: past medical bills, $44,150.24; past attendant care, $123,012.00; future attendant care, $3,000,000.00; impairment of future earning capacity, $125,000.00; and past future physical and mental pain and suffering, $500,000.00 (in accordance with LSA-R.S. 13:5106).
From this judgment, DPS appeals, urging the following assignments of error:
1. The trial judge erred in finding that Mr. Tanner's poor vision was a cause of the accident.
2. The trial judge erred in failing to find the plaintiff comparatively negligent.
3. The trial judge erred in stating that he was not required to determine the fault of Mr. Tanner and the truck, and in failing to reduce the state's solidary liability accordingly.
4. The trial judge erred in awarding $123,012.00 for past attendant care.

TRIAL TESTIMONY AND EVIDENCE[4]
Mr. Tanner's ophthalmologist, Dr. Thomas Hebert, testified that Mr. Tanner first *510 consulted him on January 22, 1977 because he had been discharged from the Navy in 1966 due to poor vision. Dr. Hebert found that Mr. Tanner suffered from macular degeneration, an untreatable disease where the central part of the retina slowly degenerates for an unknown reason; macular degeneration affects three to five degrees of a person's vision; this affected area is where a person gets his most acute vision; the peripheral vision, which is naturally blurry, is not affected. Dr. Hebert found that Mr. Tanner's vision was 20/100 in his right eye and 20/80 in his left eye. Louisiana requires at least 20/40 vision in one eye for driving.
Dr. Hebert saw Mr. Tanner again on May 11, 1979 and on February 11, 1985. In February, 1985, Mr. Tanner's vision was 20/300 in each eye. A person is legally blind if his vision is 20/200.
Dr. Hebert did not think he had advised Mr. Tanner not to drive. Dr. Hebert was also of the opinion that Mr. Tanner would not necessarily know that his vision was deteriorating so that he should not drive since the disease's progress was so slow. According to Dr. Hebert, many people with vision as bad as Mr. Tanner's drive, although they should not, and "do amazingly well." Dr. Hebert explained that these people have good driving records because they adapt as their vision fails, "because they have learned their limitations and they make the absolute maximum use of their peripheral vision. They watch themselves. They know they are dealing with less vision, so they are moreThey concentrate maybe more than the rest of us do."
Mr. Tanner testified that he received his first driver's license in 1963; in 1964, he entered the Navy and was discharged in 1966 due to poor vision. He was color blind and his vision was 20/50 or 20/60 in 1966. Mr. Tanner learned he had macular degeneration in the early 1970's. Mr. Tanner failed an eye examination while renewing a driver's license in 1970 and he was given a form to be filled out by an "eye doctor verifying how my vision was." Mr. Tanner took the form to a Gonzales optometrist who filled it out; he returned the form and was given a license. Restrictions 3 and 4 were placed on the license; these restrictions meant that his eyes could not be corrected and he needed to use a left outside rearview mirror. His last eye examination was in 1985 with Dr. Hebert and he was told his vision was 20/300. Mr. Tanner stated that Dr. Hebert did not tell him he should not drive and Mr. Tanner did not ask Dr. Hebert if he should drive. In 1986, Mr. Tanner renewed his driver's license at the DPS office in Gonzales. He was not given an eye examination. Mr. Tanner was unaware that an eye examination was required when a driver's license was renewed.
Mr. Tanner said that he believed he was a safe driver and that he had been driving for 22 or 23 years with only one minor "fender bender" occurring. He testified that no one told him he should not drive and that he had no reason to believe he should not drive. According to Mr. Tanner, even after the accident, no one from the state told him he should not drive; a week before trial Mr. Tanner was called in by DPS to take a vision test, which he failed. The DPS employee gave him a form to take to a doctor similar to what he received in 1972.
On December 19, 1986, the Tanners left French Settlement between 10:00 a.m. and 11:00 a.m. to travel to Baxley, Georgia, a 650 mile trip. Mr. Tanner and the plaintiff took turns driving. Mr. Tanner described the accident as follows: He was traveling 50-55 mph on a straight road at night in a light drizzle when the plaintiff (who Mr. Tanner said is legally blind in one eye but has normal vision when corrected in the other) saw the truck and called it to Mr. Tanner's attention. Mr. Tanner had not seen it before, but when his wife said something, he noticed it blocking half of the road, "creeping out" and "barely moving", and immediately hit his brakes. His pickup truck skidded, crashing into the truck which at that point was blocking the entire road. Mr. Tanner testified that immediately prior to the accident, he was paying attention.
*511 On cross-examination, Mr. Tanner testified that the plaintiff was aware he had vision problems and that he was aware of her vision problems. Mr. Tanner testified that in February, 1985, he applied for social security disability and for disability from the union based upon legal blindness. Mr. Tanner was granted the disability benefits. Mr. Tanner also testified that he had a rear end collision in 1977 and one in the 1960's in Gonzales.
Trooper R.L. Prine, the officer who investigated the accident, testified that when he arrived at the accident scene, the truck was completely blocking the road; the truck had pulled out of the driveway to a convenience store, and as it turned a front tire became stuck in the mud of the shoulder so that the truck could not move. Trooper Prine testified that as he approached the scene of the accident from the opposite direction of Mr. Tanner, he could see the truck 1500-1600 feet away. Trooper Prine testified that the truck had running lights across its top, that from his observation nothing obstructed Mr. Tanner's view of the truck, and that from Mr. Tanner's direction approaching the truck, he could see .3 mile easily, even with the mist. According to Trooper Prine, the accident started when the truck blocked the road.
Duaine Evans testified on behalf of the plaintiff as an expert in traffic engineering. We summarize Evans' testimony as follows. Based on a speed of 55 mph, a reaction time of 2 seconds, and a 213 foot skidmark, Mr. Tanner saw the truck 375 feet prior to impact; based on the same speed and skidmark but with a 1.5 second reaction time, Mr. Tanner saw the truck 335 feet prior to impact. To be able to avoid the accident, under the same conditions, Mr. Tanner would have had to have seen the truck at least 415 feet away. Mr. Tanner's reaction time was approximately 2 seconds and he skidded for 4 seconds; thus, he saw the truck 6 seconds prior to impact. The truck was in the road for 8-10 seconds prior to the accident and was clearly visible to any vehicle at least 650 feet to 810 feet away. Evans said that one could easily see four times that distance on the highway. Evans stated that if Mr. Tanner had seen the truck at 650-810 feet, the accident would not have happened.
Evans conducted a test on November 2, 1988 to determine Mr. Tanner's ability to see a similar truck under similar circumstances. In the test, an aluminum colored eighteen wheeler was used. Mr. Tanner as a passenger in a pickup truck approached the eighteen wheeler straddling a two lane road. Mr. Tanner said he could see the truck when they were approximately 369 feet from it with the lights on low beams and 469 feet with high beams. Evans explained that the truck used in the test would have been less visible to Mr. Tanner because of its color and because there was less light in the test situation; however, it was not drizzling or misting when the test was conducted, increasing visibility in the testing situation.
Evans opined that the sole cause of the accident was Mr. Tanner's inability to see the truck far enough away to avoid a collision.
Dr. Billy Seay, a professor of psychology, testified as an expert witness for the plaintiff in psychology, particularly in sensation perception. Dr. Seay participated with Evans and Mr. Tanner in the test to determine when Mr. Tanner could see a large truck under circumstances similar to the accident. When Dr. Seay asked Mr. Tanner to describe what he saw when he said he saw the test truck, Dr. Seay realized that Mr. Tanner was describing a speed limit sign that he perceived as the door of the truck. Dr. Seay explained that Mr. Tanner would think the speed limit sign was the test truck because he was aware that he was supposed to see a truck pulled across the road and that he was going to be asked when he saw it. Dr. Seay testified that although the test truck had running lights, Mr. Tanner could not discern them. The test was run 6-10 times, and the speed limit sign was covered up. In Dr. Seay's opinion, Mr. Tanner never saw the test truck.
Dr. Seay believed it was reasonable for Mr. Tanner to believe he was a safe driver, *512 because Mr. Tanner did not know how limited his vision was. Dr. Seay explained this as follows:
Because he fills in and because it [the macular degeneration] is gradually developing. He has goneI think in the deposition it shows from, I think something like 20/40 to 20/400 or 20/80 to 20/400, a considerable shift in his ability over the years. He has been compensating for that, I think he has probably gotten very good at using peripheral vision and sound and other sources of information. So, he doesn't know there is a hole out there.
He doesn't see a hole. He sees a blurred fill in. So there is that. He was driving throughout this time and so, I don't know how heunless he had had a series of accidents.
On cross-examination, when Dr. Seay was asked whether Mr. Tanner's discharge from the Navy due to vision problems would make him aware he was an unsafe driver, he answered:
He would know, did know that he had visual problems.... He was `legally blind.' ... That term, as I try to think about how that would reflect on his opinion of his own ability to drive, he is driving when that determination is made, he is continuing to drive during the period of time the determination is made, he does not have as far as I can tell from the record a series of problems in driving, it is hard for me to conclude that he should know not to drive anymore than he should know not to climb a flight of stairs or climb a ladder, because basically what he is doing is, he is continuing a kind of a behavior that he has successfully accomplished.
One of Mr. Tanner's co-worker's, Joseph Thibodeaux, testified that in 1980 and 1981, he and Mr. Tanner car pooled. Thibodeaux stated that he was aware that Mr. Tanner had a vision problem, but that it did not affect Mr. Tanner's driving and that Thibodeaux felt safe with Mr. Tanner. Thibodeaux did not ride with Mr. Tanner in 1985 or 1986.

ASSIGNMENT OF ERROR NO. 1: CAUSATION
DPS contends on appeal that the plaintiff did not prove that Mr. Tanner's poor eyesight was a cause-in-fact of the accident. DPS argues that based on Evans' calculations, Mr. Tanner required from 375 to 415 feet to stop; because the test showed that Mr. Tanner could see a truck 469 feet away, he should have been able to stop in time, DPS contends. DPS argues that there are three other explanations for Mr. Tanner's failure to stop:
(a) the truck suddenly pulled into Mr. Tanner's path and blocked it when Mr. Tanner was so near that a driver with licensable or even perfect vision could not have stopped; or
(b) Mr. Tanner was not paying attention and therefore collided with the truck, which he could have both seen (even with his poor eyesight) and avoided; or
(c) Mr. Tanner so greatly exceeded the speed limit as to be unable to stop in time to avoid hitting the truck that had just entered his path, although a vehicle traveling at or moderately above the speed limit could have stopped.
We have carefully and thoroughly reviewed DPS' contentions based on the standard of review set forth by the supreme court in Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have *513 weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.
* * * * * *
When findings are based on determinations regarding the credibility of witnesses the manifest errorclearly wrong standard demands great deference to the trier of fact's findings' for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
(Citations omitted.)
A thorough review of the entire record indicates that the trial judge's findings are reasonable, and thus are not manifestly erroneous or clearly wrong. Mr. Tanner's testimony was that he was paying attention and keeping a proper lookout immediately before the accident; Mr. Tanner stated that he was traveling between 50-55 mph before the accident. That the truck was visible from as far away as 1500 to 1600 feet was established by Trooper Prine's testimony. That Mr. Tanner could not see the truck early enough to avoid a collision was established in part by Dr. Seay's testimony dealing with the test he and Evans had conducted with Mr. Tanner, which indicated how poor his vision was.
DPS contends that the most probable cause of the accident was the truck pulling out in front of Mr. Tanner when he was less than the required stopping distance away.[5] We have carefully examined this contention and find it has no merit.
DPS next argues that its duty toward the plaintiff not to license Mr. Tanner did not include the risks that caused her injury. DPS contends that the risks that caused the plaintiff's injury were the three other possible causes of the accident that it suggests. Because we have found that the trial judge was not clearly wrong in determining that Mr. Tanner's poor vision was the cause of the accident, DPS' duty not to license a legally blind driver did include the risk of the plaintiff's injury.[6] DPS' first assignment of error has no merit.
For a logical review of the record, we consider the following two assignments of error in reverse order.

ASSIGNMENT OF ERROR NO. 3: REDUCTION OF LIABILITY FOR DPS
DPS contends that if it is at fault, then Mr. Tanner and the truck were also at fault and thus solidary obligors; because the plaintiff released Mr. Tanner and the truck, DPS' liability should be reduced by the percentages of fault of Mr. Tanner and the truck.
The trial judge found that the plaintiff was not at fault and stated that based on LSA-C.C. art. 2323, he was not required to determine the fault of any other party. The trial judge then stated that as to DPS, because it did not seek contribution from *514 anyone and because it did not establish "by any documentary evidence or by any testimony that any release or compromise had been entered into the parties previously dismissed," DPS would be liable for the entire judgment.
A plaintiff's release of a joint tortfeasor reduces the amount recoverable against the remaining tortfeasors by the amount of the virile (pro rata) share of the one released, since the plaintiff, in releasing a joint tortfeasor, has prejudiced the remaining tortfeasors by depriving them of their right of contribution from the one released. Joseph v. Ford Motor Co., 509 So.2d 1, 3 (La.1987). While the trial judge correctly stated that DPS did not seek contribution or establish that any release had been entered into, the record does show that the plaintiff dismissed her suit against the truck driver and Mr. Tanner's insurer with prejudice prior to trial. We conclude that the dismissal with prejudice eliminated any right of contribution DPS might have had against those parties, and therefore find the dismissal to have the force and effect of a full release of the tortfeasors. Perkins v. Scaffolding Rental and Erection Service, 568 So.2d 549 (La.1990).[7]See also Luke v. Signal Oil & Gas Co., 523 F.2d 1190 (5th Cir.1975).
We further find that the record shows that the truck was also at fault in causing the accident and that the trial court did not err in finding it to be 35% at fault.
Additionally, we find the trial court erred in not making a determination of fault on the part of Mr. Tanner and reducing plaintiff's award by Mr. Tanner's percentage of fault.
Mr. Tanner knew that he had been discharged from the Navy in 1966 due to poor vision. He knew by the early 1970's that he had macular degeneration. He knew he failed an eye examination for a driver's license in 1970 and was given a restrictive license only after examination by an optometrist. He knew that in February of 1985 he applied for social security disability and disability from the union based on legal blindness. He knew that he was granted disability benefits after being determined legally blind based upon an examination by Dr. Hebert, on February 11, 1985, which found his vision to be 20/300 in each eye. He had to know that in the very least his bad vision problems could affect his driving ability. However, at the time of the accident he was driving at night, in a drizzling rain, after having been on the road since between 10 and 11:00 that morning. The extent of Mr. Tanner's vision problem belies his assertion that he did not and could not have known that he should not be driving. According to evidence presented by Mr. Tanner, he failed to see an 18 wheel truck straddling the highway until at a point where he could not avoid it, even though a person with ordinary vision could see the same vehicle under the conditions present at the accident from 1500-1600 feet away. Further, according to testimony of his own expert, Mr. Tanner misidentified a speed limit sign for an 18 wheeler from 369 feet when weather conditions were optimal.
Given all the evidence presented it borders on incredible that Mr. Tanner was so blind that he could not see an 18 wheel truck across the road in front of him, but was not so blind that he would realize driving endangered himself and others simply because he had a license. The state is responsible for taking steps, which they apparently did not take here, to see that drivers who are physically incapable of driving are not licensed to do so. At the same time, those people who know, or who in the exercise of ordinary judgment should know, that they pose a threat to the safety of themselves and others by driving when they are physically impaired from doing so must also bear responsibility for their own *515 actions. The mere fact that the state mistakenly issues them a license does not relieve them from responsibility for their own failure to exercise ordinary care for their own safety and the safety of others by refraining from doing that which they know themselves incapable of doing in a reasonably safe manner. Mr. Tanner knew that he was blind. In the exercise of ordinary, reasonable judgment he should have realized he posed a danger to himself and others, in the least by driving under the conditions present at the time of the accident.
The record supports an assessment of at least 35 percent fault on the part of Mr. Tanner. Therefore, we find that the plaintiff's assignment of error has merit and we reduce the judgment against DPS by 35% for the negligence of the truck and an additional 35% for the negligence of Mr. Tanner.

ASSIGNMENT OF ERROR NO. 2: PLAINTIFF'S FAULT
DPS contends that because the plaintiff was aware of her husband's bad eyesight, she was at fault for riding with him. Ordinarily, a driver's negligence is not imputable to a guest passenger under the theory that an automobile passenger is usually incapable of influencing the driver's behavior. Adams v. Security Inc. Co. of Hartford, 543 So.2d 480 (La.1989). However, there have been instances when the court's have found independent negligence on the part of the guests for voluntarily exposing themselves to a known risk by entering the vehicle in the first place. Thus, negligence has been imputed to a guest for riding in a vehicle knowing the driver to be intoxicated. Cormier v. Royal Indemnity Insurance Company, 279 So.2d 253 (La.App. 3rd Cir.1973). Although Mr. Tanner realized or should have realized his own driving incapacities the same is not necessarily true of Mrs. Tanner. The evidence reflects that she knew of his blindness. However, the record is void of evidence to show the extent of her knowledge of his capability to drive, whether he had communicated concern as to his capacity or whether she had observed actions on his part that would have reasonably indicated that he should not drive under any conditions. Lacking this evidence, we cannot say that the trial judge was clearly wrong in finding that the plaintiff possessed a good faith belief that her husband was a safe driver despite his vision problems and thus, she was not at fault for riding with him. This assignment of error has no merit.

ASSIGNMENT OF ERROR NO. 4: AWARD FOR PAST ATTENDANT CARE
DPS contends that the trial judge erred in awarding the plaintiff $123,012.00 for past attendant care because the award is not supported by the record.
The plaintiff's evidence regarding past attendant care was the testimony of Cheryl Ellsworth, who stated that before she was hired, the family attended to the plaintiff. She testified that her employment began at "the end of September or the first of October." Since the trial took place on November 9-11, 1988, Ellsworth appears to have been speaking of September or October, 1988. Ellsworth testified that she worked for 10 or 12 hours a week at $7.65 an hour. Mr. Tanner testified that after the accident, he looked after his wife, and if he left, friends of the family or neighbors would attend to her.
The plaintiff's medical experts all testified that she required constant supervision. Dr. Robert Voogt, a rehabilitation counseling expert, testified that the plaintiff would require twenty-four hour care in the future which would cost $62,087.00 per year. Dr. Voogt testified that the twenty-four hour care would consist of 14 hours with a skilled attendant at $7.65 an hour and 10 hours with a companion at $6.30 an hour.
The plaintiff in brief correctly cites the law: "The fact that medical attention and nursing have been rendered gratuitously will not preclude the injured party from recovering the value of such services." Bordelon v. Aetna Casualty & Surety Co., 494 So.2d 1283 (La.App. 2d Cir. 1986), citing Williams v. Campbell, 185 So. *516 683 (La.App. 2d Cir.1938). However, the court in Williams further stated:
We hold, however, that a claim for sitting expenses rendered gratuitously by nonprofessional family members without a doctor's orders must be viewed with close scrutiny. The need for the services must be shown, the reasonableness of the fee must be established, and the extent and duration of the services must be proven.
494 So.2d at 1289.
We find that the plaintiff met the burden of proof set forth in Williams because the medical experts testified unequivocally that the plaintiff required constant supervision; furthermore, Dr. Voogt testified that the charge for a companion such as the plaintiff's husband was $6.30 per hour, and Mr. Tanner and Ellsworth testified that before she was hired, he, other family members, friends or neighbors would attend the plaintiff. Taking into account that Ellsworth, a skilled attendant, was hired only two months prior to trial and not immediately following the accident, we reduce the trial judge's award from $123,012.00 to $102,400.20.[8]
For the above reasons the trial court judgment is amended in part to provide that the judgment of past attendant care is $102,400.20. It is reversed in its failure to find Mr. Tanner negligent and to reduce the judgment by the percentage of negligence of Mr. Tanner and the truck, amounting to 70% In all other respects, the judgment is affirmed. Cost of this appeal to be paid equally by both parties, with DPS assessed $381.25.
REVERSED IN PART, AMENDED AND AS AMENDED, AFFIRMED.
SAVOIE, J., dissents and assigns reasons.
SAVOIE, Judge, dissenting in part:
From that portion of the majority opinion which assigns 35% comparative negligence to Mr. Tanner I respectively dissent.
Much of the expert testimony in this matter related to the insidious nature of the disease that affected Mr. Tanner's vision. Additional evidence supported the proposition that Mr. Tanner was never advised that he could not drive.
Finding that the plaintiff and Mr. Tanner were not at fault the trial judge reasoned as follows:
Plaintiff's husband was obviously aware of a visual problem, but was laboring under a good faith belief that his eye sight [sic] was sufficient to enable him to be a properly licensed driver in the State of Louisiana. The expert testimony established that because macular degeneration is a slow and progressive disease, Mr. Tanner would not have been aware that his vision had become more severely limited. Because of his previous experiments [experiences] as a safe driver, he would justifiably feel competent to drive in the absence of being denied a driver's license. There was no evidence adduced that plaintiff's husband was aware of his own visual limitation with regard to the safety of his own driving ability. Defendant's contention that plaintiff herself was negligent in riding with her husband is without merit. There was no evidence at all to suggest negligence on plaintiff's part or any awareness on her part that her husband was less than a safe driver, and the evidence was uncontradicted that her husband and others were under good faith belief that he was a safe driver.
In analyzing in the factors ennunciated in Watson v. State Farm and Casualty Insurance Company, 469 So.2d 967 (S.Ct.1985), this Court considers the evidence that Donald Tanner had driven safely for twenty-five years, Hebert, his opthalmologist [sic], and Dr. Seay, the *517 expert in sensory perception, Donald Tanner had no reason to believe that he could not drive safely. The testimony likewise clearly establish [sic] that Betty Tanner was under the belief that Donald Tanner was a safe driver and that his vision was sufficient for driving. Also, Mr. Tanner's fellow workers and family felt that he was a safe driver. Mrs. Tanner was unaware of the danger in its entirety.
After thoroughly reviewing the evidence in accordance with the precepts set forth in Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989), I cannot say that the trial judge was clearly wrong in finding that Mr. Tanner possessed a good faith belief that he was a safe driver despite his vision problems. While this court has a constitutional duty to review law and fact it is axiomatic that this court must give great weight to the factual conclusions reached by the trial court. It appears to me that the majority is substituting its own evaluations and inferences for those of the trial court. Had the trial judge found comparative negligence on the part of Mr. Tanner and used as its reasons for judgment the language of the majority opinion, I would have been inclined to agree since the reasoning of the majority is not without some merit. However, the factual conclusion reached by the trial court was that Mr. Tanner was not guilty of negligence. Evidence in the record supports such a conclusion. The giving of great weight to the conclusion of the trial court tips the scale in favor of an affirmation. Careful reading of the record in its entirety reveals that one of the reasonable conclusions to be drawn is that Mr. Tanner was free from negligence.
In particular, I note several instances where the majority has substituted its inferences of fact where those of the trial judge were reasonable in light of the record viewed in its entirety. For example, to infer that Mr. Tanner should have known that he should not drive, the majority states that Mr. Tanner was discharged from the Navy in 1966 due to poor vision; yet I note that additional evidence in the record shows that Mr. Tanner continued to drive safely afterwards for twenty years, and again, that he was never advised that he should not drive. The majority also points out that Mr. Tanner failed an eye examination in 1970 and was only given a restricted driver's license. Mr. Tanner could have easily inferred that he could safely drive, since he had received a driver's license and thus was not prohibited from driving; again, this inference would also be supported by his good driving record. Finally, the majority states that Mr. Tanner was receiving social security disability benefits; again, any inference drawn from this evidence must be viewed in light of the record in its entirety, which as repeatedly stated, contains evidence of a good driving record for over twenty years, a license issued to Mr. Tanner, and testimony regarding the nature of the eye disease from which Mr. Tanner suffered. I reiterate, "where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." Rosell, 549 So.2d at 844 (Citations omitted). Because I believe that the trial judge's factual finding that Mr. Tanner was not negligent is reasonable in light of the record reviewed in its entirety and is therefore not manifestly erroneous or clearly wrong, I respectfully dissent from the majority opinion finding Mr. Tanner 35% at fault.
NOTES
[1] Betty Tanner was interdicted and the procedural plaintiff is her curator and brother-in-law, Daniel Tanner. We refer to Betty Tanner as plaintiff in this opinion. In the opinion, "Mr. Tanner refers to Donald Tanner, the husband of Betty Tanner.
[2] Other defendants were Country Wide Truck Service, Inc., the owner of the truck tractor; Bobby Davis Transport Co., Inc., the owner of the truck trailer; Fireman's Fund Insurance Co., the truck's insurer, and Allstate Insurance Company, Mr. Tanner's insurer.
[3] LSA-R.S. 32:408 read in pertinent part at the time of Mr. Tanner's 1986 license renewal, the accident, and trial, as follows

A. (1) The department through the Drivers License Division or a qualified representative so designated and approved by the secretary before issuing a license shall require every applicant who under this Chapter must take an examination to submit to an examination by its authorized representatives as to his qualifications....
* * * * * *
(3)(a) Examinations shall be designed specifically to test operators of each type of vehicle including, but not limited to, automobiles, trucks, busses, truck-trailers, tractor-trailers, motorcycles, and power cycles.
(b) Each such examination shall include a test of the applicant's eyesight, his ability to understand highway signs regulating, warning, and directing traffic, his knowledge of traffic regulations of this state, and shall include an actual demonstration of ability to exercise ordinary and reasonable control in the operation of the particular type of vehicle for which the applicant is applying for a license to operate.
* * * * * *
F. The license of each applicant shall be endorsed appropriately with respect to his qualifications to operate said vehicles. Each person applying for a renewal license shall be tested with respect to his qualifications at least once every four years, provided, however, that the department may waive the actual demonstration of the applicant's ability to operate the vehicle.
LSA-R.S. 32:408 was amended in 1989 by Act 1989, No. 293 Sec. 1. The act still requires eyesight testing upon renewal of a license.
[4] Because DPS has not appealed the trial judge's finding that it failed to administer eye examinations to Mr. Tanner when he renewed his license we will not discuss any of DPS' testimony or evidence regarding the renewal of Mr. Tanner's driver's license and DPS' duty to administer eye examinations on renewal. We note that DPS' evidence and testimony at trial concerned these matters only.
[5] We note that DPS supports this contention with the following: (1) Mr. Tanner's testimony that he was 200 to 300 feet away when the truck appeared; (2) the 213 foot skidmark (which added to the 60½ feet of travel during normal ¾ second reaction time, would place him only 273.5 feet away); (3) Mr. Tanner's ability to see an 18 wheeler from 469 feet in the test Evans and Dr. Seay conducted; (4) the plaintiff's ability to see the 18 wheeler from 1,500 feet; and (5) the fair presumption that both Mr. Tanner and his wife would have had their eyes on the road.

This contention is not supported by the record. Mr. Tanner testified that he did not know how far away he was when the truck appeared; furthermore, the normal reaction time DPS sets forth is not based on any evidence or testimony of record. While the test demonstrated Mr. Tanner could see a truck 469 feet away, based on the circumstances of the test, the trial judge reasonably could find that Mr. Tanner could actually see much less than this distance. Finally, as to the plaintiff, "a guest in an automobile has no duty to supervise the driver." Adams v. Security Insurance Co. of Hartford, 543 So.2d 480 (La.1989). Because the trial judge found that the plaintiff thought that Mr. Tanner was a safe driver despite his vision problems, she had no duty to supervise his driving.
[6] We note two other cases where the courts have recognized that the state may be held liable for injury or death caused by an improperly licensed driver. Fowler v. Roberts, 556 So.2d 1 (La.1989); Alessi v. Allstate Insurance Co., 400 So.2d 1089 (La.App. 1st Cir.1981).
[7] In Perkins v. Scaffolding Rental and Erection Service, Inc., 568 So.2d 549 (La.1990), the supreme court affirmed the trial court's judgment in a tort suit sustaining an exception of no cause of action raised by Conoco an alleged co-tortfeasor, as to the third party demand of Safway for contribution. The court held that Safway's claim for contribution was based on subrogation and that the plaintiffs had no rights to subrogate to Safway as to the facts alleged in the third party demand since their claims against Conoco were dismissed with prejudice.
[8] We reached this figure by multiplying the number of months the plaintiff was taken care of by her husband or family or friends (21 months, January, 1987 through September, 1988) by the charge for a companion ($6.30 per hour at 24 hours per day at 30 days per month). The product is $95,256.00. To this, we added the figure derived from 14 hours with a skilled attendant and 10 hours with a companion for 42 days. (14 hrs. per day × $7.65 per hr. × 42 days + 10 hrs. per day × $6.30 per hr. × 42 days = $7,144.20).