723 So.2d 1056 (1998)
James and Jackie LeBLANC, Plaintiffs-Appellees,
v.
Tyrone A. STEPTORE, Conoco, Inc. and Kemper Insurance Company, Defendants-Appellants.
No. 98-808
Court of Appeal of Louisiana, Third Circuit.
December 9, 1998.
*1057 Aaron Jay Allen, Lafayette, for James and Jackie LeBlanc.
John Allen Jeansonne, Jr., G. Andrew Veazey, and Donald W. Washington, Lafayette, for Tyrone A. Steptore, et al.
BEFORE: THIBODEAUX, DECUIR, and GREMILLION, Judges.
THIBODEAUX, Judge.
The defendants, Tyrone A. Steptore, Conoco, Inc., Kemper Insurance Company, and Lumberman's Mutual Casualty Company (hereinafter collectively referred to as "Conoco") appeal a judgment against them for 70% of the liability in a motor vehicle accident between Conoco driver, Steptore, and the plaintiff, James LeBlanc. The defendants also appeal a disability and bodily impairment award of $13,000.00 and a loss of earnings award of $22,000.00 to James LeBlanc, as well as a loss of consortium award of $6,500.00 to Jackie LeBlanc.
For the following reasons, we affirm all awards granted to the LeBlancs and also affirm the 70% allocation of fault to Conoco for the actions of its driver, Tyrone A. Steptore, in executing a left turn from a stop sign into the right of way of James LeBlanc.

I.

ISSUES
We shall decide:
1) whether the jury and trial court committed manifest error in allocating fault at 70% to Conoco and 30% to James LeBlanc; and
2) Whether the monetary awards for disability, loss of earning and earning capacity, and loss of consortium constitute abuses of discretion.

*1058 II.

FACTS
James LeBlanc, age 34, was driving from his home on Dulles Drive to work at Flexcon, an industrial bag manufacturer in Lafayette, at approximately 3:30 a.m. on October 26, 1994. He ran into a Conoco tractor-trailer rig making a left-hand turn across LeBlanc's lane of travel. LeBlanc was traveling from west to east on Dulles, which is a favored, two-way street. Conoco driver, Tyrone Steptore, had been traveling from south to north and was emerging from a perpendicular street, North Domingue, which was governed by a stop sign. Steptore had stopped at the stop sign where North Domingue intersects with Dulles Drive, saw LeBlanc approaching from a bridge in the west, then pulled left across the intersection. Steptore was hauling 70,000 to 80,000 pounds of crude oil. The tractor portion of the Conoco rig cleared LeBlanc's eastbound lane, and the tractor's headlights were facing LeBlanc from the westbound lane as LeBlanc continued to approach from the east. LeBlanc collided with the trailer portion of the rig which was still in the eastbound lane; that is, in LeBlanc's lane of travel.
James LeBlanc was blind in his left eye, wore a corrective lens in his right eye, and was restricted from driving after dark. He suffered a comminuted fracture of the left elbow, a fracture of the right knee cap resulting in a complete separation of the patella, a fracture of the collarbone, and multiple cuts and bruises. Mr. LeBlanc underwent surgeries to his left elbow and his right knee as a result of the accident. His medical expenses were $35,643.12. He was initially awarded $46,000.00 in medical expenses which was reduced to actual expenses by remittitur via the granting of a post-trial motion for same. James LeBlanc lost full and partial wages for a total of eight months. He was able to return to his employment but not to the continuous 12-hour days he worked prior to the accident. Mr. LeBlanc was assessed with an 11% to 16% impairment of his knee. The awards not being appealed are the medical expenses and a general damage award of $78,000.00.

III.

LAW AND DISCUSSION

Standard of Review
An appellate court may not set aside the trial court's finding of fact in the absence of manifest error or unless the finding is clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Even though the appellate court may feel that its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in testimony. Stobart, 617 So.2d at 882.
The Louisiana Supreme Court has announced a two-part test for the reversal of a fact finder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Stobart, 617 So.2d at 882.

Legal Cause
Conoco's first assignment of error states that the jury's finding on legal cause is manifestly erroneous. Conoco does not apply a duty-risk analysis discussing its own actions as a "legal cause" of the accident, but quotes briefly from Malone's 1956 treatise regarding "rules of conduct" and their protections only of some persons under some circumstances against some risks. Malone, Ruminations, 9.Stan.L.Rev. 60, 73, 1956. Conoco then abandons the element of legal cause and applies the "cause-in-fact" element to the actions of James LeBlanc, stating that the accident would not have occurred "but for" the plaintiff's own negligence. However, the plaintiff's negligence is a matter that should be, and is, independently handled through a comparative fault analysis, only *1059 after a finding of fault on the part of Conoco. In that regard, Conoco maintains that "there is absolutely no proof of negligence on Steptore's part." Conoco does not discuss the "rules of conduct" at issue, which we find necessary to address, in order to determine whether the trial court committed error "in finding that Tyrone A. Steptore's conduct was a legal cause of the injuries" sustained by the LeBlancs.
The LeBlancs have asserted that Conoco driver Steptore violated the general negligence law, La.Civ.Code art. 2315, and traffic laws, La.R.S. 32:101, 32:104 and 32:123, by making a "lazy" or "short-cornered" lefthand turn across the travel lane of Mr. LeBlanc who was approaching Steptore from the left. The Louisiana traffic laws provide in pertinent part:
La.R.S.32:101. Required position and method of turning at intersections.
A.(2) Left turns on two-way roadways. At any intersection where traffic is permitted to move in both directions on each roadway entering the intersection, an approach for a left turn shall be made in that portion of the right half of the roadway nearest the center line thereof and by passing to the right of such center line where it enters the intersection and after entering the intersection the left turn shall be made so as to leave the intersection to the right of the center line of the roadway being entered. (Emphasis added)
La.R.S.32:104. Turning Movements and required signals.
A. No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in R.S. 32:101 or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such move can be made with reasonable safety. (Emphasis added)
La.R.S. 32:123. Stop signs and yield signs.
A. Preferential right of way at an intersection may be indicated by stop signs or yield signs.
B. Except when directed to proceed by a police officer or traffic control signal, every driver and operator of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the cross-walk on the near side of a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting road before entering the intersection. After having stopped, the driver shall yield the right of way to all vehicles which have entered the intersection from another highway or which are approaching so closely on said highway as to constitute an immediate hazard. (Emphasis added)
The record reflects that Conoco driver, Steptore, traveling north on North Domingue, was governed by a stop sign at the intersection, while LeBlanc, traveling from west to east on Dulles Drive, was on the favored street and had the right of way. Testimony indicates that Steptore stopped at the stop sign, saw Mr. LeBlanc approaching from the west, and Steptore pulled out into the intersection, dragging his trailer across the left lane of the roadway he was entering at approximately 12 miles per hour. The photographs in the record and testimony of investigating officer Racca confirm that impact occurred in Mr. LeBlanc's travel lane as he approached from the west and struck the trailer of the Conoco rig still in his lane.
The record also reflects that Mr. LeBlanc was not speeding but was actually traveling between 35 and 40 miles per hour, under the posted speed limit of 45 miles per hour. Hence, Conoco violated the above traffic statutes by not yielding to LeBlanc whom he saw approaching from the west on a favored street and by cutting across Mr. LeBlanc's lane of travel which was left of the center line of Dulles Drive.
Conoco, without addressing these traffic statutes, but rather by quoting Malone, implies that these rules of law do not protect Mr. LeBlanc, and asks this court to decide: "How appropriate is the rule to the facts of this controversy?"
The Louisiana Supreme Court has enunciated a five-part duty-risk analysis where a statutory negligence claim is asserted. The *1060 plaintiff must prove that: "(1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element)." Roberts v. Benoit, 605 So.2d 1032, 1051 (La. 1991).
As to the above elements, Conoco contends only that the court and jury were manifestly wrong in finding that Steptore's actions were the "legal cause" of Mr. LeBlanc's injuries under element four, the scope of protection element. The Roberts v. Benoit Court on rehearing provided a historical analysis of the "legal cause" theory, and then fine-tuned its focus on the application of legal cause in Louisiana. The Court articulated that in Louisiana the critical test is whether there is an "ease of association" between the defendant's conduct and the plaintiff's harm. Roberts, 605 So.2d at 1054. The "ease of association" test melds together the common law tests which examine foreseeability and policy considerations in determining whether the plaintiff's harm could have reasonably been anticipated by the rule enunciated. In that regard, this is an easy case.
The traffic statutes in Title 32 were specifically designed to protect drivers on Louisiana highways from each other by clearly setting forth which driver has the right of way, which lanes should be used in executing turns, and when and for how long one driver should yield to the other in order to prevent a hazard. When these laws were promulgated, we believe the legislature anticipated that a driver such as LeBlanc would collide with a vehicle pulling out into his lane of travel if that vehicle's driver did not stop first and wait until all traffic in view had passed, or at least determine that he had ample time to execute his turn before oncoming traffic reached him.
In the present case, it was estimated by expert Stephen A. Killingsworth that Steptore, pulling 70,000 to 80,000 pounds of crude oil, would take an average of 10 seconds to make the left hand turn onto Dulles Drive. It was further established that Mr. LeBlanc, traveling at 40 miles per hour toward Steptore from LeBlanc's position across the bridge and only 418 feet away from the intersection, would take 7.12 seconds to reach the intersection and only 6.28 seconds to travel the shorter distance to the point of impact with Steptore. The math is simple: LeBlanc would reach Steptore 3 to 4 seconds before Steptore would complete his turn.
Moreover, if Mr. LeBlanc had been traveling at the posted speed limit of 45 miles per hour, he would have reached Steptore even sooner, likely resulting in a head-on collision. Conoco's expert estimated Steptore's speed at 24 miles per hour but the jury apparently believed Mr. Killingsworth who stated that Steptore could not have accelerated to 24 miles per hour if he had stopped at the stop sign on North Domingue. Moreover, the damage was not consistent with a faster speed.
Steptore was an experienced tractor-trailer driver of 17-18 years, who knew that he did not have time to execute a turn onto a favored highway in the face of oncoming traffic. Yet, he not only began the turn anyway but lazily dragged his 70-80 thousand pound load into the lane left of the center of the favored highway; that is, into Mr. LeBlanc's lane. The court and jury below answered Conoco's query, "How appropriate is the rule to the facts of this controversy?" by entering judgment against Conoco. We find no manifest error in that resolution.
We believe that La.R.S. 32:101, 32:104, and 32:123 were specifically designed to protect Mr. LeBlanc from the collision which resulted from Steptore's conduct, and that Steptore's conduct is easily associated with and was the "legal cause" of Mr. LeBlanc's injuries. We do not believe that Mr. LeBlanc's vision precludes him from the protection of these statutes. Even drivers with excellent day vision can suffer poor night vision or perspective problems when faced with bright lights and oversized vehicles.

*1061 Comparative Fault
Having found that Conoco was at fault in causing Mr. LeBlanc's injuries, we must now decide the percentages of fault assigned to the parties. Conoco contends that the trial court erred in assessing the plaintiff with only 30% comparative fault in causing the accident. However, the record indicates that there is a reasonable basis for reaching such a conclusion. Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607 guided by the Watson [v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La. 1985)] factors from its earlier decision, provides:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including:
(1) whether the conduct result[ed][sic] from inadvertence or involved an awareness of the danger,
(2) how great a risk was created by the conduct,
(3) the significance of what was sought by the conduct,
(4) the capacities of the actor, whether superior or inferior, and
(5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Id. at 611.

Awareness of the Danger
The parties in this litigation have acknowledged and applied the Watson factors to support their positions. Under the first element, Conoco asserts that Mr. LeBlanc's decision to drive in spite of his limitations, instead of finding other transportation, involved "premeditated and considered awareness of the danger." Mr. LeBlanc acknowledges that he made a decision to drive in violation of the daylight driving restriction on his license, but denies that he anticipated any danger. Mr. LeBlanc had been unable to find anyone to drive him to work and therefore had, for approximately one to two weeks, been driving himself to his place of employment five minutes away without incident. Mr. LeBlanc's decision on the morning of the accident was based on need and on a considered awareness that it was not raining, the traffic was light at 3:30 a.m., his employer was only three or four miles away, he was intimately familiar with the area as he had lived and worked there for a number of years and had driven the route many times. Moreover, Mr. LeBlanc was driving well below the posted speed and on a favored street, and was not aware of any impending danger about to emerge from a side street up ahead.
Mr. Steptore on the other hand admitted that he saw Mr. LeBlanc approaching the intersection from his left, yet Steptore pulled into the intersection, failing to yield to Mr. LeBlanc who was traveling on the favored street. In fact, testimony indicates that Steptore expected Mr. LeBlanc to yield to him. Moreover, after failing to yield, Steptore made a short-cornered or "lazy" left-hand turn and dragged a 70 to 80 thousand pound load of crude oil into Mr. LeBlanc's lane of travel, violating at least three Louisiana traffic statutes. Hence, Steptore was not only aware of the danger; he created the danger.

Magnitude of the Risk Created by the Conduct
Conoco argues that Steptore was in the process of "legally and safely" maneuvering his 22-wheel vehicle from one road to the next, which he had done many times before, and which did not create an appreciable risk to the public. It argues that LeBlanc's driving in darkness posed a risk to himself and to others, and that he should be held at least 50% liable for the accident. Mr. LeBlanc argues that Steptore was operating a 70,000 to 80,000 pound tanker truck fully laden with flammable crude oil, which could have exploded upon impact causing multiple injuries and deaths, thereby creating a much greater risk to the public. We do not agree with Conoco's notion that Mr. Steptore was making a legal turn, as the record reflects that he was not. We do agree with Mr. LeBlanc.
Mr. LeBlanc could see well enough to obtain a job driving a forklift for Flexcon, where he had been employed for two to three years at the time of the accident. His vision was too good for him to receive social security disability benefits for legal blindness, which were specifically denied to him. Medical *1062 testimony was in conflict as to whether Mr. LeBlanc was "legally blind." Moreover, Dr. Scott Jacobsen, Mr. LeBlanc's optometrist since 1990, testified that because Mr. LeBlanc was born with vision problems, he had developed a confidence and ability to use all that he had and to function on a daily basis that far surpassed a person who suddenly or even gradually lost vision capabilities.
Jackie LeBlanc testified that she could not even tell that James had vision problems at home. She stated that he had prevented her from having vehicular accidents on a couple of occasions when she was driving at night because he saw things that she did not see. She further stated that James could read the clock on the courthouse wall from the back of the courtroom, find money dropped on the floor easily, play ninetendo, do mechanical and carpentry work, and cut 1/16 inch angles, as long as he was wearing his corrective lens. In fact, Mrs. LeBlanc stated at trial that during the five years that James was at Flexcon, he was employee of the year almost every year, even though his salary had only gone from about $5.00 to $5.85 an hour. Jackie LeBlanc stated that, except for the restriction on his license, James would not appear to have any vision problems. Mr. LeBlanc stated that he had no problems driving at night and abstained only because of the restrictions on his license.
James LeBlanc was traveling a short, well-known stretch of road in a small Ford Festiva on his way to work. In fact, Mr. LeBlanc lived on Dulles Drive, and was only a couple of minutes from his house. He was traveling under the speed limit. When Mr. LeBlanc hit the trailer of the greater vehicle, his Ford Festiva was flipped around and thrown into the ditch, and Mr. LeBlanc sustained lacerations and numerous broken bones (elbow, knee, clavicle), while the Conoco tanker went unharmed. At night, the bright headlights on the Conoco tanker could have easily confused even persons with excellent vision, disorienting them long enough not to see the trailing portion of the tractor-trailer rig in their lane of travel.
Under these facts, while Mr. LeBlanc may have been a risk in the small Ford Festiva, especially to himself, the 22-wheel Conoco tanker, carrying 70,000 to 80,000 pounds of flammable crude oil, presented the greater risk to others as it had the potential for doing greater damage to a greater number of people. Accordingly, we find that Conoco bears the greater fault under the "magnitude of the risk" element of the Watson analysis.

Significance of What Was Sought by the Conduct
Conoco argues only that LeBlanc's need to get to work on the morning of the accident should have been a minimal consideration, and moreover that he "consciously opted not to utilize" alternative means of transportation. However, the record reflects that Mr. LeBlanc's conduct was driven by his need for economic survival, not only on the morning of the accident but on a continuing basis. That is, Mr. LeBlanc was driven by a real fear of losing his job. It is admitted that he had vision problems and had difficulty finding employment. After a year of searching he finally obtained the position with Flexcon, and had worked many long 12-hour days operating a forklift to keep the position, and to earn a living at $5.00 an hour. Testimony indicates that he had tried to arrange alternative transportation but none was available at 3:30 in the morning. Hence, Mr. LeBlanc felt compelled by necessity to drive himself to work for a limited period of time, and he had been carefully and successfully doing so for a week or two preceding the accident. We find that Mr. LeBlanc's goal of keeping his job, where so few employment opportunities were open to him, was of extreme importance.
The Conoco driver, on the other hand, had no significant goal in sight in not yielding the right of way to which Mr. LeBlanc was entitled. Steptore was not under stringent time constraints or behind in his deliveries. He had already picked up his load of crude oil and was simply completing his delivery. His job did not depend on making that left hand turn at that exact moment and in that manner. He could have waited the estimated 7 or 8 seconds until Mr. LeBlanc passed the intersection, and he could have stayed out of Mr. LeBlanc's lane of travel. We find no appreciable or significant goal sought by Mr. *1063 Steptore that justifies his conduct, and assign him complete fault for the accident under this element of the Watson analysis.

Capacities of the Actors, Whether Superior or Inferior
Conoco contends that Mr. LeBlanc was the "superior driver" in this case because of his vantage point and his ability to reduce his speed in order to avoid the accident once Mr. Steptore had "legally preempted" the intersection. We find this position untenable. As stated, the record indicates that Steptore had not legally preempted the intersection, but rather had failed to yield the right of way to a traveler on a favored roadway, and had entered the roadway left of center, in violation of R.S.32:101, 32:104, and 32:123. Mr. LeBlanc argues that commercial truck drivers are professional drivers and sophisticated users under Louisiana law, trained to operate vehicles towing trailers and presumed to know the dangers, hazards and risks involved.
LeBlanc cites Stapleton v. Great Lakes Chemical Corp., 627 So.2d 1358 (La.1993), writ denied, 94-2220 (La.11/18/94); 646 So.2d 380, for the proposition that since a truck driver is a professional operator he is in a superior position with respect to this fourth Watson factor. We agree. A commercial truck driver in Louisiana is required to undergo testing and licensure which generally involves attending a special school designed to teach the mechanics and attendant hazards of operating big rigs on the roadways. Steptore was the superior driver and is completely at fault for the accident under this fourth Watson factor.

Extenuating Circumstances Requiring the Actor to Proceed in Haste, Without Proper Thought
We find that there were no extenuating circumstances justifying the haste of Conoco in failing to yield the right of way and wait for Mr. LeBlanc to pass through the intersection on the favored street. Mr. LeBlanc on the other hand, in driving before dawn, was acting precisely as a result of extenuating circumstances. As previously stated, he was in fear of losing his job. His wife, Jackie LeBlanc, a teacher at Crowley Middle School, usually took James to work in the early morning, with an old truck in tow, so that James could drive himself home in the afternoon. However, Jackie had broken her ankle and had not been driving James to work during the time frame of the subject accident.
The record reflects that the LeBlancs had tried to arrange for alternative transportation but no relatives or friends were available given the extremely early shift that James worked wherein he reported to work at 4:00 a.m. Likewise, his employer had no system in place to assist James. James LeBlanc simply had to get himself to work. The consequences of not doing so meant termination. James had no other job opportunities. He had applied for social security benefits but his application was denied pursuant to a mandatory eye examination which indicated that his vision was not poor enough to entitle him to benefits. Hence, the extenuating circumstances vesting Mr. LeBlanc with a minimum of fault under this element are his concerns for his livelihood and his family's economic survival.
In urging a greater allocation of fault to Mr. LeBlanc, Conoco relies upon Tanner v. Fireman's Fund Insurance Companies, 589 So.2d 507 (La.App. 1 Cir.1991), writ denied, 590 So.2d 1207 (La.1992), a similar case involving a driver with failing eyesight. However, the driver in Tanner was eventually assigned only 35% comparative fault when he failed to see and consequently struck an 18-wheeler straddling the highway until it was too late to avoid hitting it.
Moreover, the 5% differential in the 35% fault assigned to Tanner and the 30% fault allocated to Mr. LeBlanc can easily be attributed to several distinguishing facts. In Tanner, the "legally blind" driver was driving at night in the drizzling rain on a 650 mile trip to Georgia with his wife. Tanner and his wife had been driving since 10:00 or 11:00 a.m. In the present case, Mr. LeBlanc had been on the road only minutes and was on his way to work about five minutes away on a clear morning. Tanner's vision was 20/300 or worse and he was receiving social security disability benefits based on legal blindness, whereas Mr. LeBlanc's vision was 20/70 plus *1064 one in his corrected eye. Further, Mr. LeBlanc was denied social security disability benefits and, therefore, impliedly was denied the rating of "legally blind" as well. Tanner was shown during testing to have misidentified a speed limit sign for an 18-wheel vehicle from 369 feet in good weather, whereas Mr. LeBlanc's wife stated that he had saved her from accidents while driving at night because he saw things which she did not see.
Further, the 18-wheeler that Tanner eventually ran into was stationary or practically stationary at the time of impact and was straddling the highway, completely blocking both lanes of travel. Conversely in the present case, the headlights of the moving, not stationary, 22-wheeler deceptively indicated that it was in the other lane, while the trailer was still in Mr. LeBlanc's lane. We find that the distinguishing facts in Tanner more than account for the 5% differential in fault allocation between Tanner and LeBlanc, and we find no merit in Conoco's contention that the lower court herein erred in allocating only 30% fault to Mr. LeBlanc.

Damages
Conoco contends in its third, fourth, and fifth assignments of error that the jury and the court were manifestly erroneous in (3) awarding $13,000.00 to James LeBlanc for impairment of bodily functions; in (4) awarding $22,000.00 to James LeBlanc for lost earnings and earning capacity; and in (5) awarding $6,500.00 to Jackie LeBlanc for loss of consortium. "The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy of the award should be determined by the facts or circumstances particular to the case under consideration." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).

Impairment of Bodily Functions
Mr. LeBlanc sustained a fracture of his right knee cap, completely separating his patella, a comminuted fracture of his left elbow, and a fractured clavicle, along with multiple cuts and bruises over his body. He underwent surgeries to his knee and his elbow and incurred $35,643.12 in medical expenses. The jury awarded him medical expenses and $78,000.00 in general damages for pain and suffering with an additional $13,000.00 for bodily impairment and disability. Conoco argues that no evidence was presented that would lead a jury to believe that Mr. LeBlanc suffered a physical impairment. It urges that Mr. LeBlanc returned to the same type of pre-accident work and to the same hours. Conoco seeks to have the $13,000.00 award revised or in the alternative seeks a new trial based on jury sympathy and bias pursuant to Reese v. Winn-Dixie of Louisiana, Inc., 542 So.2d 68 (La.App. 3 Cir.), writ denied, 546 So.2d 1218 and 546 So.2d 1222 (La.1989).
Mr. LeBlanc on the other hand seeks to increase the disability award to $25,000.00 based upon the testimony of Dr. Morrow who assessed LeBlanc's knee with an 11% to 16% impairment. Mr. LeBlanc further points out that, contrary to Conoco's assertion, he did not return to the same continuous 12-hour days he worked prior to the accident, but became restricted to 8-hour days, and had numerous problems at work due to his knee and elbow injuries. More specifically, Mr. LeBlanc had pain when working on concrete, difficulty working on ladders, pain with kneeling, picking up and pushing things. Mr. LeBlanc urges that the impairment and disability damages of $13,000.00 are actually general damages, and that when added to the other general damage award of $78,000.00, bring his total general damage award up to $91,000.00. He cites several cases involving similar injuries valued between $46,000.00 and $100,000.00, as well as some cases awarding $75,000.00 for each separate injury.
As stated, the appellate court's role is not to decide whether an appropriate award was made, but to review the exercise of discretion by the district court. Because each case is different, the appellate court must first find an abuse of discretion before comparing the award to other reported cases with generally similar medical injuries. Youn v. Maritime Overseas Corp., 623 So.2d 1257. Conoco has *1065 pointed to no inflammatory remarks by plaintiff's counsel disclosing "a studied purpose to arouse prejudice of the jury based upon facts not in the case," pursuant to Reese v. Winn-Dixie. We find no jury bias or abuse of discretion in the lower court's award of general damages of $91,000.00 over all for Mr. LeBlanc's pain and suffering and his bodily impairment, and we will not disturb that award.

Loss of Earnings & Earning Capacity
The jury awarded Mr. LeBlanc $22,000.00 for his loss of earnings and loss of earning capacity. Conoco argues that Mr. LeBlanc did not prove lost wages and loss of earning capacity by a preponderance of the evidence pursuant to Dauzat v. Canal Ins. Co., 96-1261 (La.App. 3 Cir. 4/9/97); 692 So.2d 739. However, the record reflects that Mr. LeBlanc lost full wages for four months, then was only able to work half days for the next four months, and finally returned to 8-hour days but not to the 12-hour days he worked pre-accident. Mr. LeBlanc made $11,167.55 from January 1994 through the date of the accident on October 26, 1994. Thus, his yearly income in 1994, but for the accident, would have been $13,401.06. He made only $8,400.00 in 1995, which amounts to a loss of earnings of $5,001.06 in 1995.
Only $16,998.94 of the $22,000.00 award remains to compensate Mr. LeBlanc for losses during 1996 and 1997 and for the remainder of his work life. Mr. LeBlanc was only 34 years old at the time of the accident. Conoco indicated in a footnote that Mr. LeBlanc had quit his job with Flexcon two weeks before trial to go into the upholstery business. The record reflects that he chose self-employment due to his physical difficulties resulting from the accident. Self-employment is more flexible but less steady, and Mr. LeBlanc will likely be subject to diminished income in the future. Mr. LeBlanc's supervisor testified that he was a good, conscientious, and prompt employee, and that she knew of no complaints against him. Had he stayed with Flexcon, evidence indicates that he would never have returned to the long hours and additional pay he once received.
Damages for lost wages and earning capacity do not have to be proved with mathematical certainty, but only by such proof as reasonably establishes the plaintiff's claims. Proof may consist of the plaintiff's credible testimony alone. Veazey v. State Farm Mutual Automobile Insurance Company, 587 So.2d 5 (La.App. 3 Cir.1991). Factors to be considered in determining a proper award for lost future income are the plaintiff's physical condition before the injury, the plaintiff's work history, work consistency, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages for the remainder of his work life. Smith v. Two"R"Drilling Company, Inc., 606 So.2d 804 (La.App. 4 Cir.), writ denied, 607 So.2d 560 (La.1992). We do not find an abuse of discretion in awarding Mr. LeBlanc $22,000.00 for lost earnings and loss of earning capacity.

Loss of Consortium
Conoco asserts that Jackie LeBlanc should not receive any compensation for loss of consortium because she made the decision with Mr. LeBlanc to allow him to drive himself to work on October 26, 1994. However, Jackie LeBlanc's award is decreased by the percentage of Mr. LeBlanc's comparative fault, which is 30% in this case. Scott v. Hospital Service District No. 1 of Parish of St. Charles, 496 So.2d 270 (La.1986). To deny her consortium damages would be to penalize her twice.
Loss of consortium damages include loss of overall happiness, loss of love, affection, society, companionship, sexual relations, right of performance of material services, right of support, aid and assistance, and felicity. In order to prove a claim for loss of consortium, the plaintiff must prove (1) liability of the defendant, (2) his/her spouse's damages, (3) his/her consequent loss of consortium damages. Bellard v. South Central Bell Telephone Co., 96-1426 (La.App. 3 Cir.); 702 So.2d 695, writ denied, 97-2415 (La.12/12/97); 704 So.2d 1202.
Jackie LeBlanc saw her husband at the accident site and did not even recognize him, as he was swollen and covered with *1066 blood. She had to nurse him back to health, take over his duties on their farm and around the house, endure his changes of mood and loss of sociability both after the accident and at the time of trial three years later. Mrs. LeBlanc also has had to care for Mr. LeBlanc's foster parent who is in his 80's without the assistance she used to receive from James. We do not find an abuse of discretion in the jury's award of $6,500.00 for this loss of support, society and consortium.

IV.

CONCLUSION
Based upon the foregoing reasons and our finding of no manifest error, we affirm the 70% allocation of fault to Conoco and the 30% allocation of fault to James LeBlanc for the injuries sustained by Mr. LeBlanc in the vehicular accident with the Conoco truck. Likewise, finding no abuse of discretion, we affirm the monetary awards against Conoco in the amount of $13,000.00 for Mr. LeBlanc's physical impairment and disability and $22,000.00 for his loss of earnings and earning capacity. Finally, we affirm the award to Jackie LeBlanc for loss of consortium in the amount of $6,500.00. Conoco is to bear the cost of this appeal.
AFFIRMED.