644 So.2d 684 (1994)
Theresa WHITE, et al.
v.
STATE of Louisiana, Through The DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS, et al.
No. 93 CA 2034.
Court of Appeal of Louisiana, First Circuit.
October 7, 1994.
Writ Denied January 6, 1995.
*686 Harold J. Lamy, Daniel Foley, New Orleans, Joseph E. Defley, Jr., Port Sulphur, for plaintiffs-appellees Theresa White, Glenda White Leonard and Athena White.
Randall J. Cashio, James L. Hilburn, Baton Rouge, for defendant-appellant State of Louisiana, et al.
Kenner O. Miller, Jr., Baton Rouge, for Affiliated Nursing Homes, d/b/a Beauregard Nursing Home.
Donna Adorno, Baton Rouge, for First Appellant State of Louisiana Through Department of Public Safety.
Before CRAIN, FOIL and WHIPPLE, JJ.
CRAIN, Judge.
This is an appeal by defendant State of Louisiana Department of Public Safety and Corrections Motor Vehicles Division (DPS) from a judgment in a personal injury action which was rendered in favor of plaintiffs.
On February 24, 1988, Theresa White was a guest passenger in an automobile owned and driven by Edward T. O'Connor. On the afternoon of the 24th Mr. O'Connor was driving both himself and Mrs. White back to the Affiliated Nursing Homes, Inc., d/b/a Beauregard Nursing Home (Beauregard) in De Ridder where both Mr. O'Connor and Mrs. White resided. They were proceeding by way of Blankenship Road, which is a two lane, two way state owned highway. The O'Connor vehicle strayed off the road surface onto the right shoulder, traveled into the ditch and eventually crashed into a concrete driveway embankment. As a result of this accident Mrs. White was severely injured. Aside from limited movement in her arms she is essentially a quadriplegic, and is totally dependent on others for daily care.
Mrs. White was 56 years old at the time of the accident. She had suffered polio as a child and as a result had been paralyzed from the hips down. She had been confined to a wheelchair since childhood. However, she was not dependent on others for daily care and activities. She had been married and divorced twice and had four children and had been able to care for herself and raise, without assistance, the four children of her *687 two marriages. After the two oldest children married, only daughters Glenda and Athena (who had Down's Syndrome and the mental age of 5 or 6 years) resided with their mother. Sometime before the accident at issue, Mrs. White's youngest daughter, Glenda (then aged 16), entered a federally financed job service program which required Glenda to temporarily move away from home to Shreveport in order to complete the program. When Glenda decided to enter the Jobs Service Program she was concerned about leaving her mother at home alone to care for Athena. Thus, Glenda insisted that Mrs. White reside temporarily at Beauregard, a local nursing home, until Glenda could complete the job training and obtain employment. Athena was placed in a state home for mentally handicapped children.
While residing at Beauregard Mrs. White met Edward O'Connor, who was also a resident of the home. Mr. O'Connor had suffered a severe stroke in 1985 which left him in a permanently debilitated condition. He was approximately 52 years old when the stroke occurred. After suffering the stroke, in the ensuing years, Mr. O'Connor made several unsuccessful attempts to live on his own. Finally, in April, 1987, Mr. O'Connor decided to reside in a nursing home and entered Beauregard. On October 7, 1987, Mr. O'Connor, while still a resident of Beauregard, obtained a driver's license. He subsequently purchased a car and obtained automobile liability insurance. He apparently kept the car at the nursing home and several times a week went for a drive. Mrs. White rode with him on several occasions. The last time Mrs. White rode as a passenger in Mr. O'Connor's car was on February 24, 1988, when the accident occurred.
Mrs. White, Glenda White Leonard and Athena White instituted this action against Mr. O'Connor, his automobile liability insurer, Andrew Jackson Casualty Insurance Company (Andrew Jackson) and DPS. DPS was named a defendant in this action for issuing a renewed driver's license to Mr. O'Connor who, they alleged, was physically incapable of driving in his debilitated condition, without requiring Mr. O'Connor to obtain a medical report regarding his ability to drive, and without requiring Mr. O'Connor to take an on-road driving test. DPS instituted third party demands against Beauregard, the City of DeRidder, O'Connor and Andrew Jackson. By amended and supplemental petition plaintiffs named Beauregard as an additional defendant. Plaintiffs subsequently entered into a written compromise agreement with O'Connor, Andrew Jackson and Beauregard, reserving their rights against the remaining defendants. The State of Louisiana Department of Health and Hospitals intervened seeking the sum of $66,988.73.
After trial on the merits, judgment was rendered in favor of plaintiffs and against DPS awarding to plaintiffs the sums of: $500,000 in general damages; $68,388.73 for past medical expenses; and $3,943,023 for future medical expenses. From this judgment DPS has appealed alleging numerous assignments of error. Plaintiffs answered the appeal alleging as error the amount of general damages awarded.

LIABILITY OF DPS
In the first assignment of error DPS contends the trial court erred in determining that the issuance of the renewed driver's license to Mr. O'Connor by DPS in October, 1987, was the cause in fact of the accident. DPS alleges that Mr. O'Connor's physical condition was not apparent to the motor vehicle officer who processed his application, thus DPS was not on notice that a medical evaluation as well as a driving test should be performed before DPS renewed his license. Additionally, DPS contends that even if it was at fault in renewing his license without further inquiry, the accident was caused by two factors: (1) Mr. O'Connor's negligence in steering with one hand and (2) the alleged substandard road surface which caused Mr. O'Connor's vehicle to veer to the right onto the shoulder and into the ditch.
In oral reasons for judgment the trial court stated:
"In this case, from a casual observation of Mr. O'Connor limping in to court, which is confirmed by all the doctors and lay witnesses, any human being would have been put on alert that the gentleman *688 should have a driver's test. He's obviously disabled.
Now, we can't discriminate against disabled people, and disabled people should be able to drive if they can do so. One of the problems with people who are disabled, and especially older people who have been driving all their lives, they overestimate their ability to perform certain tasks.
Mr. O'Connor, because he drove trucks for 10 years or more and an automobile for many years before that, was bound and determined, that he's capable of driving a vehicle. The fact that the state gave him a license confirmed in his mind that he was capable of driving a vehicle.
When tested, he has the problem of drivingweaving within the lanes which eventually will result in somebody running off the side of the road a little bit. And because of the problems with his right arm, he would have trouble recovering. With proper therapy he could be trained to drive by overcompensating, holding onto the steering wheel better with his left hand, having left-hand brakes, things like that. So he could have been tested and been given rehabilitation and could have driven safely, but he was not.
Now, the question is, did this indentation on the highway become a superseding cause to make a different state agency responsible for the accident, which causes the court to ask itself the question, is it reasonably foreseeable that a disabled driver in the State of Louisiana will encounter substandard highways and is the purpose of giving a driving test to determine whether they could handle substandard Louisiana highways? The answer is there is no doubt that a driver in Louisiana will encounter substandard highways. So it's even more important in Louisiana to have capable drivers who can drive under adverse driving conditions. So I don't find that that is a superseding cause.
It's more than obvious that the State of Louisiana should be liable for giving this gentleman a driver's license without a test, and the fact that he was not given a test was a causethe cause, in fact, of the accident. He ran into a minor depression that should have not caused an accident at all, but because of his physical condition, it resulted in a terrible accident."
Dr. William Krooss, a physician who specializes in family practice, was Mr. O'Connor's treating physician from the time Mr. O'Connor suffered the stroke in 1985 to July, 1987. In July, 1987, Dr. Krooss left his medical practice in DeRidder and moved to Jackson, Mississippi. Dr. Krooss testified by deposition that the final diagnosis upon Mr. O'Connor's hospital discharge in February, 1985, was hemorrhagic cerebrovascular accident with right hemiplegia (paralysis of the right arm and leg) along with several secondary complications which had apparently resolved by the time of discharge. Dr. Krooss monitored Mr. O'Connor's condition following the hospital discharge. In April, 1987, Dr. Krooss admitted Mr. O'Connor to Beauregard. At the time of admission, Dr. Krooss noted that Mr. O'Connor had no use of his right arm and his right wrist was contracted; his right leg was weak; he walked with the aid of a cane held in his left hand; he could not care for his personal needs; his speech was slow; he had poor insight into his condition; and he had organic brain syndrome which apparently was a result of the stroke. Dr. Krooss monitored Mr. O'Connor's condition on a monthly basis from April through June 30, 1987, when Mr. O'Connor's care was turned over to Dr. Russell Roberts, an associate of Dr. Krooss.
Dr. Krooss has performed medical evaluations, including mental status evaluations, for driver's license applicants from the DPS office in DeRidder on numerous occasions. He had not been requested to perform one on Mr. O'Connor. When queried regarding whether he thought Mr. O'Connor capable of driving an automobile in the condition he was in in June, 1987, Dr. Krooss responded: "I think anybody who has physical findings after a stroke of any significance should be tested before they're allowed to drive again..." He added:
"I think I would have told him that it would require a vehicle altered for a handicapped person for me to feel comfortable with him driving. And that even then he would probably need to have the driver's *689 test with the vehicle to determine if he could really handle it or not, that I had some concerns that he had so much weakness and trouble, that I wouldhe couldn't effectively use his right leg, I don't think, to operate a car."
Regarding Mr. O'Connor's mental acuity to drive Dr. Krooss stated:
"Well, he certainly had periods of time while I was treating him where he was profoundly depressed and was incapable of really doing much of anything. There were other times that he was better. So, I don't know. I'm trying to answer this as objectively as I can.
....
[H]e was not alert and a capable person for a period of some months during any time that I knew him. If he had ever been that way, perhaps he would have had enough mental acuity to operate a vehicle. But he was either sick with the pneumonia or had just had the stroke or was depressed off and on, you know, so that reallyhe was never clearheaded, alert and strong for any kind of sustained period while I knew him."
Regarding Mr. O'Connor's medical condition in general Dr. Krooss stated:
"[H]e was slowhe was a little slow with his answers some of the time; he was real slow other times. But he was real concrete, you know. If you ask him something, the literal words you asked him would be what he would answer. You couldn't infer anything with him. He had no insight or couldn't project in the future with him very well. He didn't seem to do that very well."
The reason for his slowness of response or lessened insight was due to the organic brain syndrome which probably resulted from the stroke. He essentially functioned mentally like a somewhat older person, "a little slower speech, a little loss of ability to plan, that sort of thing. Organic brain syndrome just meansit's a kind of a general term that means you have some decrease in brain functioning, enough to limit your activities." However, Dr. Krooss thought that Mr. O'Connor was competent to manage his own affairs.
Dr. Russell Roberts, a family practitioner and a former associate of Dr. Krooss was Mr. O'Connor's treating physician from July, 1987, to December, 1987. He testified by deposition. Dr. Roberts saw Mr. O'Connor monthly during this period at which time he evaluated Mr. O'Connor's medical condition. His diagnosis was post status C.V.A. with dense right upper extremity hemiparesis, and partial right lower hemiparesis.
Mr. O'Connor obtained his driver's license in October, 1987, while he was a patient of Dr. Roberts. Dr. Roberts was not requested to evaluate Mr. O'Connor for driving purposes. On several occasions after having obtained his license Mr. O'Connor requested that Dr. Roberts write a note to an insurance company so that he could obtain automobile liability insurance. Dr. Roberts wrote the following letter to the insurance company:
"The above patient, Mr. Edward O'Connor is a resident at Beauregard Nursing Home in DeRidder, Louisiana.
He suffered from a stroke which has left him with right hemiplegia with weakness in the right leg and minimal usage of the right arm.
He is on no medications that would cause any problem in his mental judgement.
Your consideration in this patient's requestion (sic) is appreciated."
He did not express an opinion in the letter regarding whether O'Connor was capable of driving.
Dr. Roberts stated that in the course of his medical practice he has often been asked to evaluate patients regarding their ability to drive and in doing so he has completed the forms required by DPS for this purpose. He stated that the medical evaluation for DPS purposes of a patient who has had a severe stroke should be comprised in part of the following: a review of the medical history for chance of seizures, epilepsy, hypoglycemic episodes or anything which would alter consciousness whereby the patient might lose control of the vehicle; a vision and hearing test; a neurological examination to determine the extent of any debility and to determine whether an automobile could be adapted for the patient's use; a test of the patient's *690 motor function to determine whether the patient's motor function is agile and accurate enough to manage a steering wheel and coordinated enough to apply the brakes and gas pedal appropriately; an evaluation of the patient's mental state to determine whether the patient would be susceptible to lapses of consciousness or slow mentation and slow reaction time. Stating that because he had never performed a medical evaluation for driving purposes on Mr. O'Connor, Dr. Roberts would express no opinion as to whether Mr. O'Connor should have been given a license in October, 1987.
Dr. R.C. Duplechain, a family practitioner and associate of both Dr. Krooss and Dr. Roberts, was Mr. O'Connor's treating physician from December, 1987, to time of trial. Dr. Duplechain became Mr. O'Connor's treating physician after Dr. Roberts left the medical clinic to work with Dr. Krooss in Jackson. Dr. Duplechain testified by deposition. He stated that he assessed Mr. O'Connor at the December, 1987, visit. His diagnostic impression was that Mr. O'Connor could not use his right arm or leg. He limped, dragged his leg, and was usually sitting in a rocking chair watching television when Dr. Duplechain made rounds at Beauregard. During those visits Dr. Duplechain noted that Mr. O'Connor could talk and had good mentation.
Dr. Duplechain stated that he has performed many medical evaluations for driver evaluation purposes. In his opinion an average person observing Mr. O'Connor would probably note that he could not move his arm or that something was wrong with his arm, as well as tell that he had some difficulty walking. Dr. Duplechain stated that he thought that this could be ascertained by the average untrained person without particularly studying Mr. O'Connor's movements. Further, Dr. Duplechain stated that Mr. O'Connor's condition at time of trial was not any worse than it was immediately before the February, 1988 accident. In fact, it had improved through time.
Dr. Duplechain attended Mr. O'Connor in the hospital emergency room immediately after the accident and questioned Mr. O'Connor about how the accident had occurred. Mr. O'Connor responded that he didn't know. In Dr. Duplechain's opinion Mr. O'Connor's response to that question could have been due to a medical occurrence such as blacking out, irregular heartbeat or seizures immediately prior to the accident; or an attempt by O'Connor in his own mind to block out the traumatic occurrence.
Lisa Kiper, a friend of both Mr. O'Connor and Mrs. White initially met them while serving as a volunteer at Beauregard. She was also employed for 7 to 10 months at Beauregard on weekends as a receptionist. She was living out of state at the time of trial. As a volunteer, Mrs. Kiper had often driven both Mr. O'Connor and Mrs. White, as well as other nursing home residents, to run errands such as shopping at Walmart. Mr. O'Connor told Mrs. Kiper that he wanted to obtain a driver's license. She tried to talk him out of it because she was concerned about his ability to drive. When he insisted that he was going to try to get a license anyway, she stated that she phoned the motor vehicle office in DeRidder and spoke to a motor vehicle officer expressing her concern about Mr. O'Connor's ability to drive. She asked the "clerk" to test Mr. O'Connor well. Mrs. Kiper drove Mr. O'Connor to the motor vehicle office. When she arrived she called a DPS employee aside and informed the employee of her concerns about Mr. O'Connor's driving ability. She stated that the reason she spoke to the employee surreptitiously was because Mr. O'Connor was a friend and she did not want to anger him or hurt his feelings. Because he did not have the use of his right arm, when Mr. O'Connor signed his license application, Mrs. Kiper had to hold the form steady for him to be able to sign his name.[1] This occurred in the presence of a motor vehicle officer who was supposedly required to observe all applicants for any physical handicaps which might pose a danger when driving. She stated that she was *691 amazed that Mr. O'Connor was able to obtain a license without having been given either the written or driving test.
Mrs. Kiper stated that she rode only one time as a passenger in a car while Mr. O'Connor was at the wheel. She described the trip as follows:
Q. Tell us about the trip. How was Mr. O'Connor's driving on that trip? How would you describe it?
A. Well, we rodewe drove off thewe swayed off the road a couple of times, and hehe just wasn't very good.
Q. Were you concerned about that?
A. Yes.
Q. Did you ever ride with him again?
A. No, sir.
Q. Why not?
A. I cherish my life more than that. I told him I would drive him. You know, I told him from then on that I would drive anywhere we needed to go.
Mr. O'Connor testified that he is right handed, has little or no use of his right arm; his right leg is weak; he has a fourth grade education; and he was walking with a four prong metal cane while at the DPS office when he applied for a license renewal on October 7, 1987. He stated that he informed the motor vehicle officer at that time that he had suffered a stroke in 1985. He did not recall whether the officer asked him about any debilitating effects of the stroke nor did he recall telling the officer about his arm and leg problem. He could recall, however, that when at the DPS office on October 7, 1987, he was unable to use his right arm and he had used his cane to ambulate. He stated that he was told by the officer that he had to have a doctor write a letter to the licensing bureau and also to the insurance company.
Prior to the stroke in 1985 Mr. O'Connor had a chauffeur's license. He had driven an eighteen wheeler for over ten years, and had driven cars for many more years than that. He said that prior to the stroke when driving he used his right foot on the accelerator and his right foot to brake; after the stroke and at the time of the accident he used his right foot on the accelerator and his left foot to brake and he could not use his right arm to steer. O'Connor was queried about how the accident happened.
Q. Do you remember how the accident happened?
A. No.
Q. Do you remember leaving the road at all?
A. Hit something, wheel went to the right. That's all I know.
...
Q. What do you mean by that?
A. I hit something, and the wheel pulled to the right.
Q. You say you hit something. Do you know what you hit?
A. No.
Q. When you hit something, you say the wheel pulled to the right?
A. Yes, sir.
Q. What hand did you have on the wheel at that time?
A. Left hand, the only hand I had.
Q. How fast were you going when the accident happened?
A. About 30 miles an hour.
Q. You previously testified at a deposition you were going 20 to 25. Do you know for sure how fast?
A. Twenty to twenty five.
Q. Is that correct?
A. Yeah.
Q. Well, when the wheel pulled to the right, as you say, what happened?
A. Went down in the ditch and hit that culvert. That's all.
Q. Did you hit your brake at all after you say your wheel pulled to the right?
A. Wasn't no time.
Q. You're saying you're going maybe 25 miles an hour, and you hit something, and the wheel pulled to the right, and there was no time to hit the brake at all between the time you left the road till the time you hit the culvert. Is that your testimony?
A. Yeah.
Q. Did you try to brake?

*692 A. No.
Q. Did you try to change the direction of your car in any way?
A. I tried to straighten it up, but it was too late.
Q. Do you have any idea of how fast you were going when you hit the culvert, this concrete drive strip?
A. No, I don't.
Q. And let me ask you this: When you hit the dip in the road, what type of grip did you have on the steering wheel with your left hand?
A. Light.
Q. Was there a reason you had a light grip?
A. Well, I don't know, Just
Q. Were you relaxing?
A. Relaxed.
Q. When the wheeldid your right front wheel hit that dip?
A. Yes, sir.
Q. When the right front wheel hit it, did anything happen to your steering wheel?
A. It swung to the right.
Q. Did it slip through your hands?
A. Yes, sir.
Q. And by the time you grabbed it, you were already off?
A. Yes.
DPS stipulated that no medical report form was given to Mr. O'Connor and no completed medical form was submitted by him on October 7, 1987. However, when a medical problem or physical or mental disability is either apparent or revealed to a motor vehicle officer, department policy requires the officer to give the applicant a medical form to be completed before the license application can be processed and license granted. The license application is then placed on hold until the form is completed by a physician and the department has made a determination about whether the applicant will be allowed to obtain a license.
Ruth Moses, the supervisor of licensing in the DeRidder Motor Vehicle Office in October, 1987, to time of trial, testified that Mr. O'Connor's license had expired on October 1, 1986. He applied for a renewal on October 7, 1987. According to DPS policy when a license has expired over one year the applicant is required to take a written driver's test and Mr. O'Connor should have been required to do so when he applied for a renewal because of the expiration date. Apparently through inadvertence he was not given the written driver's test. Mrs. Moses had no explanation for the divergence from department policy in this instance. Had Mr. O'Connor been required to take the written test, it would have been apparent that he had the use of only one hand and arm. This would have alerted the motor vehicle officer that a potential handicap existed; thus triggering inquiry into the need for a medical evaluation and driving test.
Kay Kendrick, the Administrator of Field Services for DPS testified that "if it is apparent that there is a disability, then the employee should advise the applicant that a medical report would need to be completed before administering any test or going on with the process." Ms. Kendrick was asked what actions should be taken by a motor vehicle officer when a person applying for a driver's license presents at the motor vehicle office walking with the aid of a quadtipped cane, limping due to an obviously weakened right leg and without the use of the right arm. Ms. Kendrick replied:
A. "Okay. I guess it's just very difficult for me to believe that someone who would walk in in that kind of shape and have to put his head up against the vision machine and all of these other things, just in the normal routine of conversing, signing the form, and doing all of these types of things, just in the normal interaction, that if he was in that bad of shape that the motor vehicle officer would not have noticed that. That's just my opinion because of the general stuff that you have to do whether you're taking a driving test or not, that they're taught to observe. The interaction, the speaking back and forth, the hearing, pushing your head on the vision machine which you have to lean on something or have good balance just to *693 push your forehead up against the vision machine.
Q. What would be the appropriate response if that was observed?
A. The employee would have given them a medical [form] if they were doing their job and the man was in that bad of shape at that particular time in '87."
She further stated that using the right foot to accelerate and the left foot to apply the brake is not considered normal, ordinary operation of a motor vehicle. A person's inability to use the right foot to both accelerate and apply the brake should place the motor vehicle clerk on notice that additional inquiries should be made into the applicant's ability to drive safely before processing the application. This step is initiated by furnishing to the applicant a medical form which must be completed by a physician. If the physician expresses no opinion regarding whether the applicant is capable of driving, department policy outlines the steps to be taken by the department including the administration of an actual driving test in order to determine whether the application should be processed.
Mrs. Pamela Watson Harrell, the motor vehicle officer who issued the license to Mr. O'Connor, stated that she had no recollection of Mr. O'Connor.
Jesse Blakeman, the investigating officer, testified that when he arrived at the scene of the accident he discovered the vehicle resting against a concrete driveway at a steep angle. He asked Mr. O'Connor why the car left the road. Mr. O'Connor responded that he didn't know and that he did not remember anything from the time he left the roadway. He further stated that Mr. O'Connor was partially incoherent at the accident scene. Officer Blakeman investigated the accident scene and stated the pavement was in good condition; there were no ruts on the side of the road; there was a slight indentation in the road surface, but no deep or obvious defects; there were no potholes at the scene; the road was a straight two lane, two way undivided highway; there were no skidmarks; and the car traveled approximately 75 feet from the place it left the road to the embankment where it rested.
James Powell, Jr. witnessed the accident. The Powell vehicle was traveling in the opposite direction from the O'Connor vehicle. Mr. Powell stated that he saw the O'Connor vehicle approaching from the opposite direction and observed the following:
"The car just seemed to just go off the road and run into the driveway, this embankment. So I got out of my car. I stopped my car and got out. I thought maybe he passed out or something because he didn't make no effort to stop. He just like got off the road and bam, didn't try to brake or nothing...."
Powell further stated that in his estimation the O'Connor vehicle was going about 35 miles per hour; there was no movement of the car indicating that it had struck anything on the road surface and the speed of the car did not seem to decrease at all before striking the embankment.
The accident occurred in front of the home of Dr. Flynn Taylor. He was aware the accident had occurred because Mrs. White was a patient of Dr. Taylor and he treated her in the hospital emergency room after the accident. Dr. Taylor described the condition of Blankenship Drive at the time of the accident as a typical old road which has been repaired often.
Dr. Olin K. Dart, accepted by the court as an expert in accident reconstruction, testified on behalf of DPS. Dr. Dart stated that in his estimation the vehicle was traveling approximately 25 miles per hour immediately before the accident occurred and at the time it struck the embankment. Mr. O'Connor apparently never decreased the speed of the vehicle from the time it left the road. According to his calculations regarding the stopping distance, i.e., the distance traveled by a vehicle from the second the driver perceives a problem to the time the brake is applied and the car comes to a complete stop, Mr. O'Connor could not have completely stopped the car within the 72 feet the car traveled from the place where it initially left the road to the embankment which it struck and came to rest. This calculation was based on a perception-reaction time of 55 feet for a car traveling 25 miles per hour. However, the trial court took judicial notice *694 of the fact that Dr. Dart's calculated perception-reaction time of 55 feet was more than double that of the Louisiana Department of Public Safety and Corrections Louisiana Driver's Guide For Classes `D' and `E which provides the perception-reaction time for a vehicle traveling 25 miles per hour is 27 feet with a total stopping distance of 61.7 feet.
According to Dr. Dart, many non-handicapped persons may at times use only one hand to steer a vehicle. The non-handicapped driver has the use of the other "good" hand as a back-up to aid in controlling the vehicle should the steering hand for some reason lose contact with the steering wheel. This is different from the situation of Mr. O'Connor who had no use of his right arm to help correct or control the steering wheel and had no suitable equipment on his car to compensate for the handicap.
Dr. Dart examined photos of the accident site taken the day following the accident. From the photos Dr. Dart could see no evidence that Mr. O'Connor tried to brake, change the course of the vehicle or regain control of the vehicle once it left the roadway. When asked whether the photos indicated a condition of the road surface which could be a contributing factor in the accident, Dr. Dart responded:
A. Well, There is theAnd this picture doesn't show it very well, but near this mark there is this depression, and I think in another picture I had seen, there was sort of somelike alligator crack. And so there was some sort of depression there, but I would have thought that most people would be able to drive through that without any problem."
Q. Particularly going 20, 25 miles an hour?
A. Absolutely.
Barbara Cole has been employed at Beauregard since 1981 and is very familiar with Blankenship Road where the accident occurred, having traveled it every workday. She stated that in the lane on which Mr. O'Connor was traveling, there was a "big sunken hole in the road" located near the edge of the road surface; it had been there for some time prior to the accident; she often tried to avoid the "hole" by veering left, so long as traffic was not approaching from the opposite direction; and when the "hole" could not be avoided the car would pull to the right. When asked how she would avoid the "hole" if there was no oncoming traffic in the left lane she responded "[j]Just holding on to your steering wheel or go over in the next lane." She arrived at the accident scene with other nursing home employees after learning of the accident. She stated that she observed the tire tracks leading into the ditch "past the depression" and "pretty close" to it. She spoke with Mr. O'Connor by telephone while he was hospitalized on the night of the accident. He told her that "he just lost control of the car when he hit that sunken place in the highway."
The trial court also considered the testimony of Lauren Eschette, an occupational therapist employed by the Rehabilitation Hospital in Baton Rouge who performed a driving evaluation of O'Connor in 1993. The evaluation was performed at the request of DPS. Ms. Eschette stated that on one occasion Mr. O'Connor pulled out in front of traffic, nearly causing a collision. She had to grab the steering wheel from him at that time and a car had to swerve in order to avoid an accident. He also switched lanes at a red light without checking whether the lane was clear of traffic. Again, Ms. Eschette had to grab the steering wheel from Mr. O'Connor and apply the brake in order to avoid an accident. He also ran off the road onto the shoulder on two occasions. On both occasions she had to cue Mr. O'Connor to let him know he was running off the road onto the shoulder. She noted that his reaction time was slow in responding to her cue. Also, when driving straight ahead, he weaved within the lane in a swaying motion approximately one foot on either side. He also misjudged the distances at stop signs sometimes stopping either 10 or 15 feet before, and sometimes 10 or 15 feet beyond the stop signs. She stated that during the evaluation he used his right foot to accelerate as well as brake the vehicle because he was not comfortable braking with the left foot and was having difficulty coordinating it. Ms. Eschette concluded that she *695 could not recommend that he drive at that time; that he enter an extensive driver's training program; and that he return to her for reassessment after successful completion of such program. Mrs. Eschette acknowledged that part of Mr. O'Connor's problem with driving may have been due to the fact that he had not driven in several years.
A review of the record reveals overwhelming evidence that Mr. O'Connor's physical condition should have been apparent to anyone seeing him walk and move about. It should have been especially apparent to a motor vehicle officer who is trained to observe applicants for possible medical conditions which could adversely impact driving and present a danger both to themselves and the motoring public.
It was overwhelmingly established that Mr. O'Connor's condition had not deteriorated between October, 1987 and time of trial. In fact, his condition had improved with time. In the improved condition, when an actual assessment of his driving was performed, he was found to be incapable of driving without additional driver's training and reassessment. In fact, at that time he ran off the edge of the road twice and had a delayed reaction to returning the car to the road surface. He also swayed to the left and right while remaining within his lane. The physical traits apparent in the driving test, as well as those noted by his treating physician and the lay persons who knew him, resulted primarily from the stroke or at least pre-dated the issuance of the license. They would definitely have required evaluation before issuance of the license. Most probably, if the results of the driving assessment are taken into account, Mr. O'Connor would have had to undergo driver's training and obtain modifications to his car in order to compensate for his physical handicap. Possibly restrictions would have been placed on his license commensurate with his handicap, or after sufficient evaluation by DPS, he may have been denied a license altogether.
Mr. O'Connor's physical handicap, his delayed reaction to events such as straying off the roadway onto the shoulder, and his lack of coordination were definitely factors in the occurrence of the accident. The argument of DPS that many non-handicapped persons drive with only one hand holding the steering wheel and fail to have an accident, does not impress us. A non-handicapped driver at least has the use of the other "good" hand or arm to assist the driver should they lose control of the wheel. A handicapped driver with the use of only one arm usually has been trained to drive a car which has been specially equipped to allow the handicapped driver to compensate for his handicap and safely maneuver the car.
Regarding the argument of DPS that the condition of the roadway was the cause of the accident, we note that the alleged "hole" in the road as reported by Ms. Cole was not substantiated by the testimony of Officer Blakeman and Mr. Powell as being more than a slight depression or "alligator crack" in the surface. Officer Blakeman stated there were no potholes, the pavement was in good condition, and there was a slight indentation in the road surface. The trial court refrained from finding that the road was substandard. It concluded that if the highway was substandard, this was a common problem on Louisiana highways, and a driver should be capable of safely driving on them. This should be anticipated by DPS when issuing licenses or renewals. The trial court's finding that the condition of the road surface was not a cause of the injury is not manifestly erroneous.
Because Mr. O'Connor's medical condition was a contributing factor in the accident, DPS' issuance of the renewed license without first requiring a medical evaluation, a written and an actual driving test was a cause in fact of the accident. Causation is a factual determination which should not be set aside absent manifest error. Housley v. Cerise, 579 So.2d 973 (La.1991). The trial court's finding in this regard is reasonable and thus not manifestly erroneous. Stobart v. State Department of Transportation and Development, 617 So.2d 880 (La.1993).
The duty of DPS to adopt reasonable procedures to ensure safety on the highways in both the initial issuance of a license, as well as in the renewal or continuation of the authority to drive, is applicable in the situation *696 of handicapped drivers whose condition may present a danger to the public, including guest passengers of that driver. See Tanner v. Fireman's Fund Insurance Companies, 589 So.2d 507 (La.App. 1st Cir.1991), writs denied, 590 So.2d 1207 (La.1992). In failing to properly evaluate Mr. O'Connor's medical condition regarding his ability to drive safely, DPS violated its own regulations. This resulted in breach of the duty owed by DPS to plaintiffs. The injuries suffered by Mrs. White were within the scope of the duty.

DRIVER FAULT
In the fifth assignment of error DPS contends that the trial court erred in failing to attribute fault on the part of Mr. O'Connor.
In oral reasons for judgment the court stated:
"Now, was he contributorily negligent? There is testimony from a doctor that he has the same opinion about his driving ability that a drunk driver would have about his driving ability; that he thought he could drive, and there was nothing in his mind that would prevent him from driving, and his being able to drive for four months confirmed in his mind that he could drive. So I don't think he was contributorily negligent because, if he had been given the driver's test, he would have been turned down. To hold him contributorily negligent would be to say that every teenager that goes to the drivers' license bureau should know that teenagers are less capable of handling cars. And that's why we have driving tests, is to weed out the teenagers who are in fact unable to drive because every teenager thinks they can drive."
The trial court analogized Mr. O'Connor's belief that he could drive to that of drunken drivers who mistakenly believe that they are capable of driving. However, we could no less hold Mr. O'Connor unaccountable for his actions in this situation than we could absolve a drunken driver from fault where the actions of the drunken driver caused or contributed to an accident, despite the mistaken belief of the drunken driver that he was sober enough to drive safely. A driver whose judgment is impaired either by a physical or mental handicap or by alcohol or drug use should be accountable for his actions when this condition is a cause of an accident. Mr. O'Connor's belief that he could drive does not excuse his poor judgment and unsafe driving.
"The state is responsible for taking steps, which they apparently did not take here, to see that drivers who are physically incapable of driving are not licensed to do so. At the same time, those people who know, or who in the exercise of ordinary judgment should know, that they pose a threat to the safety of themselves and others by driving when they are physically impaired from doing so must also bear responsibility for their own actions. The mere fact that the state mistakenly issues them a license does not relieve them from responsibility for their own failure to exercise ordinary care for their own safety and the safety of others by refraining from doing that which they know themselves incapable of doing in a reasonably safe manner."
Tanner v. Fireman's Fund, 589 So.2d at 514-515. Mr. O'Connor knew that he had limited use of his right leg and no use of his right arm. He is a former professional driver and should have known that the use of only one arm to drive and the use of his left foot to brake the car and his lack of coordination presented a danger to both himself and others. He should have known better. He failed to exercise ordinary reasonable judgment by driving in this condition.
The record supports an assessment of 50% fault on the part of Mr. O'Connor.
This assignment of error has merit.

FAULT OF THERESA WHITE
In the sixth assignment of error DPS contends the trial court erred in failing to assess fault on the part of Mrs. White for riding as a guest passenger with Mr. O'Connor at the wheel, given his erratic driving as attested to by several witnesses.
A driver's negligence is generally not imputable to his guest passenger except in instances where the guest has voluntarily *697 exposed himself to a known risk by entering a vehicle in the first place. Tanner v. Fireman's Fund, 589 So.2d at 515. Mrs. White is not a sophisticated or educated person. She had no schooling whatsoever and has never driven a car. She was totally dependent on others for transportation throughout her life. The evidence is not sufficient to convince us that the trial court was manifestly erroneous in attributing no fault to Mrs. White for riding as a guest passenger with Mr. O'Connor at the wheel. This assignment is without merit.

FAULT OF NURSING HOME
In the seventh assignment of error DPS contends the trial court erred in failing to attribute fault to Beauregard in allowing Mrs. White to ride with Mr. O'Connor.
Neither Mrs. White nor Mr. O'Connor were interdicted, nor had Mrs. White's family ever instructed nursing home personnel that Mrs. White was to be prevented from riding in a car driven by Mr. O'Connor. Even if Mrs. White's family so instructed nursing home personnel, it is questionable whether they would have had the authority to prevent her from so doing. No evidence was introduced to convince the trial court otherwise. Thus, a review of the record does not convince us that the trial court was manifestly erroneous in not attributing fault to the nursing home.

ASSIGNMENTS OF ERROR NOS. 2 AND 4
In the second assignment of error appellants contend the trial court erred in allowing evidence of the driving assessment performed over 5 years after the accident. We note the assessment at issue was performed at the request of DPS, which on appeal is contesting its admissibility. DPS also argues that the driving test is not relevant because Mr. O'Connor used his right foot to brake, not the left foot, which he used when the accident occurred. However, Mr. O'Connor apparently initially tried to operate the brake with the left and right foot and was evidently more comfortable using the right foot during the driving test. The driving test would have probably been even more interesting had he used the left foot which, according to Ms. Eschette, he could not coordinate with the right. Besides, the result of the driving test was only cumulative evidence regarding Mr. O'Connor's impaired ability to drive at the time both the license was issued and the accident occurred. This assignment is without merit.
In the fourth assignment of error DPS contends the trial court erred in failing to allow evidence of a "duly licensed one arm school bus driver." This assignment was not briefed and is thus considered abandoned. Uniform Rules of Louisiana Courts of Appeal 2-12.4.

State Immunity From Discretionary Acts
In the third assignment of error DPS contends that in 1987, a motor vehicle officer had the discretion to require the completion of a medical report and/or driving test. Pursuant to La.R.S. 9:2798.1 a public entity is immune from liability for discretionary acts which are within the course and scope of their lawful powers and duties. Thus, DPS claims it is immune from liability for not requiring a medical evaluation and/or driving test in this instance.
A two-step analysis is used to determine whether the discretionary function exception to state liability is applicable to a particular case.
"First, a court must determine whether the action is a matter of choice. If no options are involved, the exception does not apply. If the action involves selection among alternatives, the court must determine whether the choice was policy based. Decisions at an operational level can be discretionary if based on policy."
Rick v. State, Department of Transportation and Development, 93-1776, 93-1784 (La. 1/14/94); 630 So.2d 1271, 1276. A review of the Policy and Procedure Statements of DPS, numbers 18 and 23 which were effective in 1987 reveal that a motor vehicle officer did not have the discretion to ignore the apparently severe and obvious physical handicaps exhibited by Mr. O'Connor and decide to renew his license without requiring further evaluation. To the contrary, a motor *698 vehicle officer observing a person with apparent medical or physical problems and taking no steps to require a medical evaluation or driving test in order to determine the applicant's ability to drive safely without presenting a danger on the highway and to the public at large, is operational negligence. DPS Policy/Procedure Statement #23.0 adopts La.R.S. 32:403.1 and 403.2 and provides that "[y]ou may waive the requirement for a medical report at renewal if the disability has been previously evaluated." (Emphasis ours). As stated above, the disability had never been previously evaluated. This assignment is without merit.

QUANTUM

a.) Excessive special damage award to Mrs. White

In the eighth assignment of error DPS contends the special damages award of $3,943,023 for future medical care and treatment is excessive and should be reduced to at least the sum of $3,291,533.46.
Mrs. White has had and will continue to face the following medical conditions resulting from the accident on a daily basis for the rest of her life: quadriplegia; tracheostomy dependent; neurogenic bowel; neurogenic bladder; recurrent urinary tract infections; recurrent pulmonary infections; possible seizure disorder; and depression.
She will have the following physical and mental limitations: quadriplegia with very limited movement of the fingers and toes; unable to turn herself; unable to transfer or assist with transfers from her bed to a chair or bath etc.; unable to bathe independently; unable to feed herself; unable to dress herself; incontinent of bowel; incontinent of bladder; unable to utilize a wheelchair; unable to visit significant others outside of the nursing home; depression; sadness; isolation; and inability to provide for personal affairs. She will require skilled nursing care; periodic evaluation and monitoring of her physical condition as well as physical therapy and occupational therapy. She will need assistance with the following programs which are required daily and should be incorporated as a permanent component of her lifestyle: joint range of motion and control of spasticity; skin care program to prevent skin breakdown; developing skills for activities of daily living; an environmental control unit; mobility and transportation items such as an appropriate wheelchair and a specially equipped van for community transportation; home renovations if required, or alternatively skilled nursing care in a lifelong residential treatment center.
Mrs. White was 63 years old at time of trial. Her life expectancy as established by Robert Voogt, PhD., a rehabilitation specialist, was 20.3 years. This figure was based on the life expectancy for a white female of her age taken from the U.S. Government Tables rather than on the shorter life span expectancy of 13 years submitted by DPS' expert which is normally assigned to quadriplegics. In Dr. Voogt's opinion, the life span of a quadriplegic is dependent on the type of care received by that person. With more advanced care the life expectancy is lengthened to that comparable to a non-quadriplegic. The sum estimated by Dr. Voogt for yearly at home care for Mrs. White is $286,374. The sum required yearly for residential care in a facility is $207,718. The sum awarded for her future medical needs and care was $3,943,023.
An award of quantum should not be set aside absent abuse of discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). The trial court obviously found Mrs. White's life expectancy to be in line with that suggested by Dr. Voogt and based his award accordingly. That determination is not manifestly erroneous. Neither is the sum awarded for special damages an abuse of the trial court's much discretion.

b.) General damages

In the ninth assignment of error DPS contends the awards for loss of consortium were abuses of the trial court's much discretion. Plaintiffs allege as error that the general damages award of $500,000 which was apportioned among the plaintiffs was awarded in conformity with the statutory cap prescribed by La.R.S. 13:5106(B)(1) which was subsequently held unconstitutional in Chamberlain v. State Department of Transportation and *699 Development, 624 So.2d 874 (La.1993). They argue the award is no longer limited by the cap and should thus be increased.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), our supreme court further articulated the standard for judicial review of general damages awards:
"[T]he discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award."
The judgment decrees a total general damages award of $500,000. Glenda White Leonard was awarded the sum of $200,000 and Athena White was awarded the sum of $50,000. The judgment reflects that the court divided "the maximum general damages award of $500,000 amongst the three plaintiffs in the same proportion as each of their unlimited general damages awards bears to the maximum collective general damage award."
In reading the judgment it is clear that the trial court limited the general damage award to that allowed by the statutory cap imposed by La.R.S. 13:5106(B)(1) which was held to be unconstitutional in Chamberlain v. State Department of Transportation and Development, 624 So.2d at 884. Because the statutory cap is no longer applicable we must perform a de novo review in order to award general damages. We have discussed at length the pain and suffering of Mrs. White, both past and future. She was once an active, outgoing person involved in many activities. She loved going shopping, going to church, visiting with friends, crocheting, chatting with neighbors, visiting her daughter Athena at Athena's state home. Since the accident she can no longer crochet, attend church, go shopping or even wheel herself about in her wheelchair. She cannot even change channels on the TV nor adjust room temperature. She cannot be transported outside the confines of her nursing home except by ambulance. Her life has changed drastically. Accordingly, we hold that the lowest award which can reasonably be granted to Mrs. White is the sum of $1,000,000. The awards of $200,000 and $50,000 to Glenda White Leonard and Athena White respectively were not abuses of the trial court's discretion.

DECREE
Accordingly, the judgment of the trial court is affirmed as to the finding of fault on the part of DPS, but is amended to reduce the fault of DPS to fifty per cent. That portion of the judgment finding no fault on the part of O'Connor is reversed and that fault is assessed at fifty percent. The judgment is affirmed in all other respects relating to fault and liability.
The judgment is amended to increase the general damage award to Mrs. White to one million dollars. In all other respects the damage awards are affirmed. Costs in the amount of $1,074 are assessed to DPS.
REVERSED IN PART, AMENDED IN PART, AND AS AMENDED, AFFIRMED.
NOTES
[1] During the period at issue (October, 1987 through February, 1988) it is unclear whether Mrs. Kiper was employed by Beauregard. Neither plaintiffs nor DPS have alleged that Mrs. Kiper was acting as an employee on behalf of Beauregard when she took Mr. O'Connor to obtain his driver's license.